## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DISTRICT

FEROLIE CORPORATION,

       Petitioner,

       v.

ADVANTAGE SALES & MARKETING, LLC,
ALLIED CAPITAL CORPORATION, and
ADVANTAGE SALES & MARKETING, INC.,

       Respondents.

JUDGE NORGLE

04 C 5425

MAGISTRATE JUDGE BOBRICK

### PETITION TO COMPEL ARBITRATION

Petitioner Ferolie Corporation ("Ferolie") respectfully petitions this Court for an Order

and Judgment, pursuant to Section 4 of the Federal Arbitration Act, 9 U.S.C. § 4: (i) compelling

Respondents Advantage Sales & Marketing, LLC ("ASM"), Allied Capital Corporation ("Allied

Capital") and Advantage Sales & Marketing, Inc. ("ASM Inc.") (collectively, "Respondents") to

proceed with arbitration as set forth in the arbitration provision of a certain "Affiliation and

Services Agreement," dated September 27, 2002 (the "Agreement"), a copy of which is attached

hereto as Exhibit A; and (ii) granting Ferolie such other relief as this Court may deem just and

reasonable, including the costs and disbursements of this action.

### THE PARTIES

1.      Petitioner Ferolie is a New Jersey corporation having its principal place of

business in Montvale, New Jersey. Ferolie is a third generation family-owned corporation that

has operated a food brokerage business in the Metropolitan New York market area for over 50

years. Food brokers such as Ferolie serve as independent sales and marketing agents for

manufacturers of consumer packaged goods, providing sales, marketing and retail merchandising

services on a commission basis. Ferolie's clients include, among others, Bumble Bee, J.O.

Butler, Del Pharmaceuticals, Eagle Family Foods, Johnson & Johnson (including Neutrogena),

Marzetti, Masterfoods (including Seeds of Change), McCormick, Phillips, Revlon, S.C. Johnson, Sunbeam and SunMaid.

2.    Upon information and belief, Respondent ASM is a California limited liability company headquartered in Irvine, California, and is a national food broker with current annual commission revenues in excess of $700 million. Prior to June 30, 2004, ASM's members ("Members") comprised a consortium of local and regional food brokers in various market areas throughout the United States. Upon information and belief, on or about June 30, 2004, virtually all of ASM's Members participated in a "roll-up" transaction, or consolidation (the "Consolidation"), by which the ASM Members and their individual ownership interests in ASM were acquired by Allied Capital through its subsidiary, ASM Inc. -- which was formed solely for the purpose of facilitating Allied Capital's $257 million acquisition of ASM.

3.    Upon information and belief, Respondent Allied Capital is a Maryland corporation with its principal place of business at 1919 Pennsylvania Avenue NW, in Washington, D.C., and is the nation's largest business development company, providing long-term debt and equity investment capital to companies in a variety of industries. Allied Capital, whose common stock is publicly traded on the New York State Exchange under the symbol "ALD," has regional offices at 401 North Michigan Avenue, Suite 2050, in Chicago, Illinois. Upon information and belief, as a result of the June 30, 2004 Consolidation, Allied Capital now holds a majority ownership stake in ASM.

4.    Upon information and belief, Respondent ASM Inc. is a California corporation with its principal place of business at 1919 Pennsylvania Avenue NW, in Washington, D.C. Upon information and belief, ASM Inc. is a majority-owned portfolio corporation formed by Allied Capital for the sole purpose of facilitating the Consolidation of ASM's Members.

### JURISDICTION AND VENUE

5.    This Court has jurisdiction over the subject matter of this action pursuant to the federal diversity statute, 28 U.S.C. § 1332(a)(1), in that this action is between citizens of

different States and the amount in controversy exceeds, exclusive of interest and costs, the sum of $75,000.

6.      This Court has personal jurisdiction over Respondents because ASM and its acquirors/successors -- *i.e.*, Allied Capital and ASM Inc. -- have contractually agreed (pursuant to the Agreement) to resolve all claims and disputes with Ferolie before an arbitrator in Chicago, Illinois.  In addition, Allied Capital has regional offices in Chicago, and thus is subject to the general jurisdiction of this Court.

7.      Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(a)(3) in that ASM and its acquirors/successors -- Allied Capital and ASM Inc. -- are subject to the personal jurisdiction of this Court.  In addition, Ferolie was required to file its petition to compel arbitration in this Court under Section 4 of the Federal Arbitration Act, 9 U.S.C. §4, because the Agreement explicitly provides that all disputes between Ferolie and ASM (and ASM's acquirors/successors) shall be submitted to arbitration in Chicago, Illinois.

## FACTUAL BACKGROUND

### The Affiliation and Services Agreement

8.      On or about September 27, 2002, Ferolie and ASM entered into the Agreement, the express intent and purpose of which was to enable Ferolie -- which agreed to convert its ASM membership into a contractual affiliation with ASM -- to continue serving the national clients Ferolie shared with ASM as if it were still an ASM Member.  In particular, Section 2 of the Agreement required ASM to, among other things:  (i) provide Ferolie with the same "corporate and sales support" and all other services ASM provides to its Members; (ii) provide Ferolie with all services ASM or its Members provide to their clients and customers; and (iii) provide Ferolie with any other services that may be required to enable Ferolie to provide "seamless representation" with that provided to clients and customers by ASM or the ASM Members. Ex. A § 2.

9.     In addition, Section 4 of the Agreement included provisions that were specifically designed and negotiated to enable Ferolie to participate in certain transactions affecting ASM or its Members (such as the Consolidation) as if Ferolie were still an ASM Member. Indeed, at the time the Agreement was entered into, ASM was already in discussions with Allied Capital about a potential acquisition. Since Ferolie would have had a right to participate in such a transaction as a Member of ASM, Section 4(b) of the Agreement preserved this right by enabling Ferolie to elect to participate in such an ASM transaction "on the same terms and conditions" and "based upon the same consideration" received by ASM and/or its Members -- either for Ferolie's entire business or just the national clients it shared with ASM.

### Respondents' Blatant Disregard of Ferolie's Right to Participate in the Consolidation Under the Agreement

10.     Notwithstanding the plain terms of the Agreement, ASM breached its obligations to Ferolie under the Agreement virtually from the outset. Shortly after the Agreement was entered into, ASM and Allied Capital embarked on a scheme to take away Ferolie's national clients and prevent Ferolie from participating in the Consolidation. The execution of this scheme would unjustly enrich ASM and Allied Capital at Ferolie's expense by enabling ASM and Allied Capital to obtain Ferolie's national clients without having to pay for them in the Consolidation.

11.     Specifically, Allied Capital and its subsidiary, ASM Inc., encouraged and/or otherwise caused ASM to (i) violate Section 4(c) of the Agreement by failing to provide Ferolie with proper notice of the Consolidation; (ii) improperly demand that Ferolie make an election to participate in the Consolidation, despite knowing that inadequate information had been provided to Ferolie for it to make such an election; and (iii) violate Section 4(b) of the Agreement by improperly denying Ferolie the right to participate in the Consolidation on the same terms and conditions and based on the same consideration as ASM Members.

12.     On December 30, 2003, ASM sent a letter to Ferolie purporting to provide notice of the Consolidation under Section 4(c) of the Agreement. ASM acknowledged that the

Consolidation was a "Transaction" in which Ferolie was entitled to elect to participate under Section 4(b) of the Agreement, and enclosed a set of draft "model transaction documents." ASM demanded that Ferolie make a binding participation election within 15 days.

13.     Ferolie notified ASM and Allied Capital that ASM's December 30, 2003 letter failed to comply with the notice requirements of Section 4(c) of the Agreement. Thus, on January 22, 2004, ASM sent a second letter to Ferolie, admitting that certain material information had been omitted from its December 30, 2003 letter. Although ASM's second letter did not cure the defects in its first letter, ASM again demanded that Ferolie make a binding participation election. Tellingly, Allied Capital also sent Ferolie a letter on January 22, 2004 demanding same, making it clear that ASM and Allied Capital were coordinating their actions.

14. By letter dated February 4, 2004, Ferolie reiterated its position that ASM had not complied with the notice provisions of Section 4(c) of the Agreement, noting that among the many deficiencies was the fact that ASM did not disclose the consideration being received by ASM Members or the complete terms on which Ferolie could participate in the Consolidation for its national client business. Ferolie also pointed out that ASM's explanation of the valuation for Ferolie's national clients made it apparent (even with inadequate information) that Ferolie was not being afforded the opportunity to participate on the "same terms and conditions" or for the "same consideration" as ASM Members, in manifest violation of Section 4(b) of the Agreement.

15.     Ferolie's February 4, 2004 letter also stated its willingness (despite having inadequate information) to participate in the Consolidation for its national clients, provided that Ferolie received the consideration required under the Agreement. ASM knew or should have known that Ferolie's February 4 letter did not constitute a rejection of Ferolie's participation in the Consolidation, because ASM never provided Ferolie with proper notice under Section 4(c) of the Agreement, nor had ASM offered Ferolie the consideration to which Ferolie was entitled under Section 4(b) of the Agreement. Nevertheless, ASM informed Ferolie on February 5, 2004

that Ferolie's February 4, 2004 letter somehow "terminated Ferolie's ability to participate in the Transaction."

## Respondents Circumvent the California Department of Corporations Decision, and Consummate the Consolidation in Violation of the Agreement

16. On or about December 22, 2003 (unbeknownst to Ferolie at the time), ASM Inc. filed an application with the California Department of Corporations ("CDOC") for a permit to issue securities in connection with the Consolidation. For such a permit to be issued, the CDOC would first have to hold a hearing to determine that the terms and conditions of the Consolidation were "fair, just and equitable." When Ferolie finally became aware of ASM Inc.'s application in or about February 2004, Ferolie immediately sought to participate in the CDOC fairness hearing process, asserting that it had not received proper notice of the Consolidation pursuant to Section 4(c) of the Agreement and was improperly denied its right to participate pursuant to Section 4(b).

17. On April 19, 2004, after considering various briefs and submissions, the Commissioner of the CDOC issued a decision declining even to hold a fairness hearing on the Application until Ferolie's right to participate in the Consolidation was resolved.

18. By the time Ferolie first learned of the CDOC Commissioner's decision in mid-May (the CDOC omitted to copy Ferolie on its transmittal of the decision), ASM Inc. had withdrawn its application, and ASM and Allied Capital had secretly begun their plans to consummate the Consolidation without a CDOC permit and without any adjudication of Ferolie's right to participate therein.

19. Upon information and belief, to eliminate the need for a CDOC permit (or SEC registration, the only alternative mechanism provided for in the "model transaction documents"), ASM and Allied Capital agreed to modify the terms, structure and/or certain elements of the Consolidation. However, since this modification would by definition constitute a new "Transaction," the Agreement required that Ferolie be given notice of and an opportunity to participate in the modified Consolidation.

20. To avoid providing Ferolie with such notice, and/or in retaliation for Ferolie's successful intervention in the CDOC hearing process, ASM, in concert with Allied Capital and ASM Inc., unilaterally deemed the Agreement "terminated," without basis and in violation of Section 3 of the Agreement.

21. ASM sent Ferolie a purported "notice of breach" claiming that *Ferolie* had somehow breached the Agreement by (i) holding itself out as an "affiliate" of ASM (notwithstanding Ferolie's status under the "*Affiliation* and Services Agreement"), (ii) communicating directly with an ASM third-party vendor in an effort to obtain the "seamless" retail reporting services that ASM refused to provide (notwithstanding that ASM had instructed Ferolie to contact the vendor directly for such purpose), and (iii) by successfully interfering with ASM Inc.'s CDOC Application (notwithstanding that, in so doing, Ferolie had properly exercised its First Amendment right to petition a government body).

22. ASM and Allied Capital consummated the Consolidation on or about June 30, 2004 – without providing notice to Ferolie, without affording Ferolie an opportunity to elect to participate, without compensating Ferolie for any of the business improperly gained by ASM at Ferolie's expense through breaches of the Agreement and other misconduct, and without any adjudication of Ferolie's contract rights – in blatant circumvention of the CDOC decision and in violation of the Agreement.

23. Thus, as a result of the Consolidation, ASM and Allied Capital have succeeded in accomplishing their scheme. To date, ASM has taken Ferolie clients that comprised roughly 65% of Ferolie's national client business. Ferolie now seeks damages (for the harm the Respondents have caused to Ferolie's business) as well as equitable relief (including, among other things, a determination that the Consolidation was consummated in violation of the Agreement).

## The Arbitration Provision and Respondents' Refusal to Arbitrate

24.     The Agreement contains a broad arbitration provision, which states as follows:

> Dispute Resolution. Except as provided below, *all claims and disputes between or among the parties hereto, including, without limitation, those arising under this Agreement (including, without limitation, its interpretation, enforcement, enforceability, termination or breach) shall be submitted to arbitration before a single arbitrator in [] Chicago, Illinois*, under AAA procedural rules and Illinois discovery rules (subject to the arbitrator's sole discretion to impose limits on such discovery).

Ex. A § 17 (emphasis added).

25.     Significantly, the arbitration provision applies not only to Ferolie and ASM, but also to ASM's acquirors or successors. Under Section 4(g) of the Agreement, ASM and its Members were prohibited from consummating a transaction, such as the Consolidation, unless ASM's "acquiror or successor therein expressly agrees in writing in favor of [Ferolie] to accept and assume the continued obligations of ASM under this Agreement . . . ." Thus, pursuant to the express terms of the Agreement, prior to consummating the Consolidation, Allied Capital and ASM Inc. -- as ASM's acquirors/successors -- were required to accept and assume all of the continuing obligations of ASM under the Agreement in favor of Ferolie, including the obligation to arbitrate all disputes with Ferolie.

26.     In addition, Section 21 of the Agreement provides that it is binding upon Ferolie and ASM, as well as "their respective successors and assigns." As a result of the Consolidation, either by operation of law or contract, Allied Capital and ASM Inc. became the successors and acquirors of ASM. Allied Capital and ASM Inc. each had knowledge of the Agreement before the Consolidation and, consequently, they are bound by the Agreement, including, without limitation, the obligation to arbitrate under Section 17 thereof.

27.     Despite the clear and unambiguous arbitration provision in the Agreement, and despite Allied Capital's and ASM Inc.'s required acceptance and assumption of ASM's

obligations under the Agreement, the Respondents have steadfastly refused to arbitrate their dispute with Ferolie.

28.     In particular, on November 6, 2003, Ferolie served a Demand for Arbitration on ASM pursuant to the arbitration provision in Section 17 of the Agreement. Beginning in December 2003, after ASM ignored the Demand, Ferolie's attorneys, Lowenstein Sandler, called counsel for ASM several times and left phone messages advising counsel that the American Arbitration Association administered claims filed in Chicago (the arbitration forum bargained for in the Agreement) from Dallas, Texas. Lowenstein Sandler also informed counsel for ASM that the Center for Public Resources ("CPR") was the dominant ADR organization in Chicago.

29.     After several phone calls over the course of several months (during which time the parties were involved in proceedings before the CDOC in connection with ASM Inc.'s application for a permit to issue securities for the Consolidation), ASM's counsel finally responded to Lowenstein Sandler, stating that ASM wanted to arbitrate in Chicago, but never giving his position on whether he would agree to use the CPR.

30.     On May 18, 2004, Lowenstein Sandler wrote a letter to ASM's counsel again communicating Ferolie's desire to arbitrate its claims against ASM. In that letter, Lowenstein Sandler reminded ASM's counsel that the dispute between Ferolie and ASM required arbitration pursuant to Section 17 of the Agreement. ASM's counsel, however, never responded.

31.     On July 26, 2004, Lowenstein Sandler wrote yet another letter to counsel for ASM, Allied Capital and ASM Inc., reiterating its position that all disputes between Ferolie and ASM were subject to arbitration pursuant to the plain terms of the Agreement. In the July 26 letter, Lowenstein Sandler also noted that because the Consolidation had been consummated on or about June 30, 2004, it appeared that ASM's obligation to arbitrate under the Agreement now extended to Allied Capital and ASM Inc. as ASM's acquirors/successors. Accordingly, Lowenstein Sandler asked all counsel to respond to the July 26 letter by advising whether their respective clients intended to arbitrate pursuant to the Agreement.

32.     In a letter dated July 28, 2004, counsel for ASM advised Lowenstein Sandler that because Ferolie had purportedly "waived" its right to arbitrate, ASM "does not consent to arbitration of Ferolie's claims and will resist any attempt by Ferolie to arbitrate its claims."

33.     In a letter dated July 29, 2004, counsel for Allied Capital advised Lowenstein Sandler that "Allied is not a party to the [Agreement], nor is Allied bound by the requirements of the [Agreement]," and that "Allied will not consent to arbitration of Ferolie's claims pursuant to the procedures provided in Section 17 of the [Agreement]."

34.     In a letter dated August 3, 2004, counsel for ASM Inc. advised Lowenstein Sandler that it was unable to respond to its July 26, 2004 letter at that time, but would "inform you shortly of its position regarding arbitration." To date, however, ASM Inc. has not provided any further response and has otherwise continued its refusal to arbitrate against Ferolie.

35.     On August 10, 2004, Ferolie served an Amended Demand for Arbitration on ASM, Allied Capital and ASM Inc. A copy of the Amended Demand for Arbitration is attached hereto as Exhibit B. Contemporaneous with its service of the Amended Demand for Arbitration, Lowenstein Sandler transmitted to Respondents and their counsel a written demand that Respondents proceed to arbitration as required under the Agreement's broad arbitration provision. A copy of Lowenstein Sandler's August 10 letter is attached hereto as Exhibit C.

36.     Respondents failed to respond in any fashion to either the Amended Arbitration Demand or Lowenstein Sandler's August 10, 2004 letter. Accordingly, as the foregoing demonstrates, Respondents have persistently refused to proceed to arbitration, which refusal to arbitrate has necessitated the instant application to compel arbitration under Section 4 of the Federal Arbitration Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Petitioner Ferolie Corporation respectfully requests that the Court issue an Order and Judgment compelling Respondents to proceed with arbitration pursuant to the clear and unambiguous terms of the Agreement, together with such other and further relief as this Court may deem just and equitable, including the costs and disbursements of this action.

Respectfully submitted,

August 17, 2004

One of the Attorneys for Petitioner
FEROLIE CORPORATION

Mark P. Miller (06191128)
**WILDMAN HARROLD ALLEN & DIXON LLP**
225 W. Wacker Drive, Suite 3000
Chicago, Illinois 60606
Phone: 312.201.2000
Fax: 312.201.2555

**Of Counsel:**
David L. Harris
Steven M. Hecht
**LOWENSTEIN SANDLER PC**
Attorneys at Law
65 Livingston Avenue
Roseland, New Jersey 07068
Phone: 973.597.2500
Fax: 973.597.2400

# *Exhibit A*

AFFILIATION AND SERVICES AGREEMENT

THIS AFFILIATION AND SERVICES AGREEMENT (the "Agreement") is made this 27th day of September, 2002 (the "Effective Date") by and among Advantage Sales & Marketing, LLC, a California limited liability company ("ASM") and Ferolie Corporation, a New Jersey corporation ("Ferolie") and Buckley Thorne Messina Ferolie LLC, a Delaware limited liability company ("BTMF" and together with Ferolie, each a "Company" and collectively, the "Companies"),

WITNESSETH:

WHEREAS, ASM and the Companies are parties to a Memorandum of Agreement dated September 27, 2002 (the "Memorandum"), pursuant to which such parties, among other things, confirmed certain aspects of their future relationship; and

WHEREAS, ASM and the Companies desire to enter into this Agreement in order to implement the provisions of the Memorandum and further define and confirm their relationship, and their respective rights and obligations with respect to one another.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Agreement and in the Memorandum, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, ASM and the Companies hereby agree as follows:

1. **Ownership and Use of Marks.** Each of the Companies acknowledges that the name "Advantage," "ASM", and "Advantage Sales & Marketing", together with any and all related logos and/or stylistic forms thereof used by ASM and any and all names unrelated to the name "Advantage" as may be used from time to time by ASM, and any and all related logos (the "Marks"), are the property of ASM. Each of the Companies shall not, by virtue of this Agreement, retain or acquire any property rights in or license to use, and shall not use, the Marks in any form, including, without limitation, in its signage, advertising, stationery, or other pre-printed materials; provided, however, that the Companies shall have the right to represent that it has an affiliation with "Advantage" solely in accordance with the terms of this Agreement, either orally, or in letters, memos or other written communications, or in marketing and sales presentations, business reviews or similar communications made and disseminated to Clients and Customers. Notwithstanding the foregoing, if ASM adopts a name, logo or stylistic form of any name or mark used by a Company (except for the names, logos, marks and forms used by ASM prior to the date of this Agreement), then such Company shall not be precluded from using such name, logo or form. In recognition of the fact that, prior to the Effective Date, the Companies were permitted to use the Marks, the Companies shall each have sixty (60) days after the Effective Date within which to conform its advertising, stationery and signage to the foregoing requirements. Each Company acknowledges that all intellectual property rights in and to "Advantage," "ASM", and "Advantage Sales & Marketing", together with any and all related logos and/or stylistic forms thereof as are used by ASM on the date of this Agreement ("Names"), are and shall remain the sole property of ASM or its licensor(s), and such Company shall not, by virtue of this Agreement, acquire any proprietary interest therein. Neither Company

shall register or attempt to register any of the Names (it being understood and agreed that any breach by one Company of this provision shall not constitute a breach of this Agreement with respect to the other Company). Subject to Section 3(g), each Company's limited rights as set forth above shall be exercised only with the current market areas of each respective Company.

2.      Services and Service Fees.

(a)     Fixed Fee Services. During the Term, and upon the terms and conditions set forth in this Agreement, ASM shall provide to the Companies all services and support presently provided by ASM, directly or indirectly, to its members ("ASM Members") and/or their respective Clients or Customers, without usage-based charges (i.e., funded by ASM Members' capital contributions to ASM, but excluding the costs of third-party services currently denominated as "Marketing Costs," which shall instead be offered as Menu Services under this Agreement), including, without limitation, general corporate and sales support provided by ASM officers and personnel, use of the ASM Tri-Net to service Clients and Customers common to ASM or one or more ASM Members and either or both of the Companies, as well as such additional services and support as may from time to time be provided to ASM Members and/or their respective Clients or Customers without additional usage-based cost (collectively, the "Fixed Fee Services"). In addition, the services of ASM Client Teams (including, without limitation, National BDMs, National ROMs, RBDMs, Analysts and Administrators, whether provided by ASM or ASM Members) shall be included as Fixed Fee Services.

(b)     Fixed Fee Services Fees. During the Term, Ferolie shall pay to ASM, in consideration of the provision by ASM of the Fixed Fee Services to Ferolie, an aggregate amount equal to $150,000 per annum, payable in equal monthly installments by deduction from the payment to Ferolie of the amounts provided in paragraph 2 of the Memorandum. During the Term, BTMF shall pay to ASM in consideration of the provision by ASM of the Fixed Fee Services to BTMF, an aggregate amount equal to $50,000 per annum, payable in equal monthly installments by deduction from the payment to BTMF of the amounts provided in paragraph 2 of the Memorandum.

(c)     Menu Services. During the Term, and upon the terms and conditions set forth in this Agreement, each Company shall have the right to obtain from ASM, and ASM shall provide to each Company, on an individual, per item basis, any and all services (other than Fixed Fee Services) as ASM may directly or indirectly provide from time to time to the ASM Members and/or their respective Clients or Customers, for an additional usage-based cost (i.e., not funded by ASM Members' capital contributions to ASM), including, without limitation, the ASM ARTS retail reporting system; the Navison accounting system; Comshare; Earthlink ISP; marketing, advertising and/or consumer data (e.g., IRI, Apollo, MediaTrak, Nielsen, Spectra and Data Alchemy); TD Link; Becton Schantz; UPS; and any other usage-based services, and the services of the ASM's National Business Units, eCPG3 and any other ASM ventures (collectively, "Menu Services"). ASM's obligation to provide Menu Services to a Company shall be conditioned upon the Company's agreement to be bound by such terms and conditions of service as may be imposed by any third party provider of such services or any portion or aspect thereof (e.g., software) that is unaffiliated with ASM, and which are generally applicable to all ASM Members receiving such services.

551207-2                                          2

(d)     Menu Services Fees. During the Term, each Company shall pay to ASM, in consideration of the provision by ASM of such Menu Services as may from time to time be requested by the Company, fees ("Menu Services Fees") in amounts equal to ASM's actual, direct costs (net of all applicable discounts, rebates and/or adjustments) of each service so requested and provided, including, without limitation, any special costs that ASM incurs to make such Menu Services available to such Company.     In addition, ASM shall designate a appropriately skilled employee to manage each Company's interface with ASM's ARTS (or any replacement) retail reporting system (without the need for the Company to utilize or obtain a license for PenRite retail reporting systems or services, license; and each Company shall pay ASM's cost for the time such employee devotes to such task for such Company together with Menu Services Fees. Where a Menu Service Fee is based on a share of ASM's cost of providing a particular Menu Service to persons other than the Companies, the Menu Service Fee shall be in the case of BTMF, two (2%) percent, and in the case of Ferolie, six (6%) percent, of ASM's aggregate cost thereof for the continental United States.

(e)     Payment of Fees. ASM shall render a monthly invoice to each Company for Menu Service Fees provided to such Company in the immediately preceding calendar month. Such invoice shall be itemized to identify the individual fee for each Menu Service, and shall be accompanied by documentation substantiating the basis for each such charge, including a copy of any applicable third party invoice and a description of the method of calculation of such Company's share in accordance with this Agreement. All such invoices presented on or before the fourth day of a month shall be payable to ASM on the 20th day of such month, and all such invoices presented after the fourth day of a month shall be payable to ASM on the 30th day of the next month.

(f)     Seamless Representation. Fixed Fee Services and Menu Services to be provided under this Agreement are intended to enable each Company to receive services during the Term of the same nature and to the same extent ASM or ASM Members (or any persons or entities that such ASM Members may become following a Transaction) provide to (other) ASM Members (or any persons or entities that such ASM Members may become following a Transaction), ASM Clients and Customers, and the Clients and Customers of (other) ASM Members, so that, during the Term, Clients receiving Brokerage Services from each such Company receives the same services it would receive from ASM or an ASM Member (or any persons or entities that such ASM Members may become following a Transaction).

(g)     For purposes of this Agreement: "Brokerage Services" shall mean the representation of manufacturers, distributors, packers and other persons (each, a "Client" and, collectively, "Clients") who or which engage persons to market, sell, merchandise or advertise food and non-food items normally sold to purchasers for resale, including, without limitation supermarkets, distributors, cooperatives, convenience stores, grocery stores, mass merchandisers, club stores, drug stores, restaurants, schools or institutions (each a "Customer" and, collectively, "Customers"); and "National Clients" shall mean, with respect to a Company, those Clients for which such Company provides Brokerage Services where the Client either (X) has a contract with ASM, (Y) pays commissions to ASM for Brokerage Services rendered by such Company, or (Z) is represented or serviced by ASM. ASM Members and such Company, collectively, for

volume of no less than 80% of the United States All Commodity Volume, it being further
understood and agreed that, if such Company shall spin off any business or otherwise divide its
business from and after the date hereof, any Client represented or serviced by such new business
or division shall be considered a National Client if it meets the definition in (X), (Y) or (Z)
above; and such Company shall provide ASM with written notice of any spin off or division that
represents or services any such Client, including the name of the new business or division, if
applicable; and, effective upon the delivery of such notice by such Company, such new business
or division identified therein shall be entitled to obtain the benefits of and become subject to the
obligations under this Agreement to the same extent as such Company, and any breach of this
Agreement by any such new business or division shall be deemed to be a breach of this
Agreement by the Company.

    3.    Termination.

        (a)    Termination by the Company. A Company may terminate this Agreement
with respect to such Company at any time, with or without cause, upon thirty (30) days prior
written notice to ASM. The parties hereto acknowledge that any termination of this Agreement
by a particular Company shall not affect or in any manner impair the rights and obligations of the
other Company, or of ASM with respect to such other Company, under this Agreement.

        (b)    Termination by ASM. ASM may terminate this Agreement with respect
to a Company only (i), in the event of that Company's material breach of this Agreement, upon
thirty (30) days written notice of termination to that Company identifying the material breach in
reasonable detail; provided, however, that no such termination shall occur if the Company cures
the material breach to ASM's reasonable satisfaction within the thirty (30) day notice period; or
(ii), in the event thatCompany (A) admits in writing its inability to pay its debts generally as they
become due, (B) makes a general assignment for the benefit of creditors, (C) institutes
proceedings to be adjudicated a voluntary bankrupt, or consents to the filing of a petition of
bankruptcy against it, (D) has a decree entered against it by a court of competent jurisdiction
adjudicating it as bankrupt or insolvent, which decree is not stayed or reversed within ninety (90)
days of the date of entry, (E) seeks reorganization under any bankruptcy act, or consents to the
filing of a petition seeking such reorganization, (F) has a decree entered against it by a court of
competent jurisdiction appointing a receiver, liquidator, trustee, or assignee in bankruptcy or in
insolvency covering all or substantially all of its property or providing for the liquidation of its
property or business affairs, which decree is not stayed or reversed within ninety (90) days of the
date of entry, (G) assigns this Agreement or any rights or obligations hereunder in violation of
Section 15 below), (H) experiences a Company Change in Control (as defined in Section 3(c)
below) other than in connection with a Permitted Transaction (as defined in Section 3(d) below),
or (I) participates in any Company Change in Control transaction, joint venture, partnership or,
with respect to Company National Clients, amarketing alliance transaction with Acosta Sales and
Marketing, Crossmark Sales & Marketing, or any other national food brokerage company that
provides Brokerage Services in all of the continental United States, and that provides Brokerage
Services to one or more Clients whose products are competitive with those then represented by
ASM (provided, however, that no termination event shall exist under this sub-clause (ii)(I) solely
as a result of that Company working with one of the foregoing competitors in the ordinary course
of business to service a Client of that Company in its geographic market area that is also serviced

by any of the foregoing competitors outside of that Company's geographic market area), then, in each such case under this clause (ii), upon written notice of termination to that Company. The parties hereto acknowledge that any termination of this Agreement by ASM with respect to a particular Company shall not affect or in any manner impair the rights and obligations of the other Company, or of ASM with respect to such other Company, under this Agreement.

(c)     Definition of Company Change in Control.     For purposes of this Agreement, "Company Change in Control" shall mean, with respect to a Company, the occurrence of any of the following events: (i) any "person" or "group" of related persons acquires "beneficial ownership" or "control" (as each of those terms is defined in the Rules and Regulations of the Securities Exchange Act of 1934, as amended) of more than fifty percent (50%) of the voting power of such Company; (ii) if such Company consolidates with, or merges with or into, or participates in any reorganization with, or share exchange with, or other similar transaction with, any entity, resulting in the persons who owned or controlled more than fifty percent (50%) of the voting power of such Company immediately prior to such transaction owning or controlling fifty percent (50%) or less, of the voting power of such entity immediately after such transaction; or (iii) if such Company sells, conveys, transfers or leases all or substantially all of its assets to any person or entity; provided, however, that any series of transactions within a period of two (2) years that, when combined, would constitute a Company Change in Control within clauses (i), (ii) or (iii) above but for the lapse of time between such transactions, shall, upon the consummation of the last such transaction, be a Company Change in Control.

(d)     Definition of Permitted Transaction.     For purposes of this Agreement, "Permitted Transaction" shall mean any sale, transfer, disposition, conveyance or gift (collectively, a "Transfer") of all or any portion of the equity or assets of a Company to: (i) a trust for the benefit of the owner of such equity; (ii) a family member or a trust for the benefit of a family member of the owner of such equity; (iii) The REM Organization, Buckley, Thorne, Messina & Associates, Inc., Buckley, Thorne, Messina, McDermott & Associates, Inc. or the other Company (an "ESM Member"), a family member of any such owner, or a trust for the benefit of any such owner or a family member of any such owner; (iv) any person who at the time of such Transfer has been an employee of either Company or any ESM Member for no less than five (5) years, a family member of any such employee, or a trust for the benefit of any such employee or a family member of any such employee; or (v) any other person or entity if, upon consummation of such Transfer, more than fifty percent (50%) of the voting power of the Company continues to be owned or controlled by (a) the current owners of the Company, or the current owners of any ESM Member, (b) any natural person who at the time of such Transfer has been an employee of the Company or any ESM Member for no less than five (5) years, (c) persons or entities described in clauses (i) through (iv) above, and/or (d) any ESM Member. For purposes of this definition, family members shall include the following: descendants, parents, parents' descendants, and spouses of each of the foregoing.

55125-2                                           5

(e)    Right of First Refusal.

(i)    During the Term, if both (A) a Company receives a written offer from a third party (the "Purchaser") to acquire such Company in a Company Change in Control transaction that such Company desires to accept, and (B) desires to have such Company Change in Control transaction constitute a Permitted Transaction, then such Company shall, within five (5) days after such third party has delivered the written offer to such Company, submit a written offer (the "Offer") to enter into a Company Change in Control transaction to ASM or its acquiror or successor (the "Offeree") together with a copy of the written offer from the Purchaser, on terms and conditions, including a price not less favorable to the Purchaser than those on which such Company proposes to enter into the Company Change in Control transaction with the third party. The Offer shall disclose the terms and conditions, including price, of the proposed Company Change in Control transaction, and any other material facts relating thereto.

(ii)    The Offeree shall have the absolute right to enter into the proposed Company Change in Control transaction with such Company on the terms and conditions set forth in the Offer. If the Offeree desires to enter into the proposed Company Change in Control transaction, the Offeree shall give written notice to such effect (the "Acceptance") to the such within fifteen (15) days of the date the Offer was delivered to the Offeree (the "Acceptance Period"). Such Acceptance shall, when taken in conjunction with the Offer, be deemed to constitute a valid, legally binding and enforceable agreement with respect to the Company Change in Control transaction. In such event, such Company and the Offeree shall consummate the Company Change in Control Transaction on the terms and conditions set forth in the Offer on a date mutually agreed upon by the Selling Company and the Offeree, in no event more than sixty (60) days after timely delivery of the Acceptance (subject to receipt of all antitrust and other regulatory approvals) or such greater period as is set forth in the Offer by delivery of such documents, instruments and agreements as such Company or the Offeree shall reasonably request.

(iii)    If the Offeree fails or declines to accept the Offer by the date specified in Section 3(e)(ii) above, then such Company may consummate the proposed Company Change in Control transaction with the Purchaser upon terms and conditions, including price, not more favorable to the Purchaser than those specified in the Offer, and such transaction shall constitute a Permitted Transaction, provided, however, that such transaction is consummated within one hundred twenty (120) days after the end of the Acceptance Period, subject to receipt of antitrust and other regulatory approvals.

(f)    Effect of Termination. Upon the termination of this Agreement with respect to a Company in accordance with this Section 3, all rights granted to such Company under this Agreement shall immediately terminate.

(g)    Right to Acquire ESM Members. If a Company participates in an acquisition or other similar transaction with any ESM Member, then: (i) the references to that "Company" in this Agreement shall include that Company together with such ESM Member (including without limitation, the ESM Members' clients may qualify as Company National

551207-2                                          6

Clients to the extent applicable hereunder, and that Company's market areas hereunder shall also include the ESM Member's market areas); and (ii) such Transaction shall not constitute a breach or default under this Agreement or any other agreement between that Company or the ESM Member, on the one hand, and ASM, on the other hand, or any agreement to which two or more of them are bound; and (iii) the license and services agreements between ASM and such ESM Member may thereupon be terminated by ASM and such ESM Member shall be covered by this Agreement, and the amounts payable hereunder for the Fixed Fee Services and the Menu Services shall be adjusted as follows: (A) in the case of the fixed fee services fees under Section 2(b), the amount shall be increased by, in the case REM, $87,500, and in the case of BTMA. $87,500 per year from the date of closing; and (B) in the case of the Menu Service Fees specified in the last sentence of Section 2(d), the increase for BTMA shall be 5% and for REM shall be 4%.

4.      Effect of Transaction.

(a)     Definition of Transaction.    For purposes of this Agreement, a "Transaction" shall mean, with respect to ASM and/or the ASM Members, the occurrence of any of the following events: (i) any "person" or "group" of related persons acquires "beneficial ownership" or "control" (as each of those terms is defined in the Rules and Regulations of the Securities Exchange Act of 1934, as amended) of more than fifty percent (50%) of the voting power of ASM and/or any group of ASM Members constituting sixty-six and two-thirds (66 2/3%) percent (or such lesser percentage as is required by the ASM Amended and Restated Operating Agreement, or any successor thereto, for approval of any votes thereunder, amendments thereof or other actions taken thereunder) (the "Threshold") or more of the Membership Interest (as that term is defined in the ASM Amended and Restated Operating Agreement) or voting power of ASM; (ii) if ASM and/or any group of ASM Members constituting the Threshold or more of the Membership Interest or voting power of ASM consolidates with, or merges with or into, or participates in any reorganization with, or share exchange with, or other similar transaction with, any entity, such that the persons who owned or controlled more than fifty percent (50%) of the voting power of ASM and/or such ASM Members immediately prior to such transaction, own or control less than fifty percent (50%) of the voting power of the successor or survivor entity immediately after such transaction; or (iii) if ASM and/or any group of ASM Members constituting the Threshold or more of the Membership Interest or voting power of ASM sells, conveys, transfers, contributes or leases all or substantially all of its or their respective assets to any person or entity or (iv) if ASM dissolves or liquidates, and distributes its assets to the ASM Members and the ASM Members continue the business of ASM in any entity or group of entities: provided, however, that any series of transactions within a period of two (2) years that, when combined, would constitute a Transaction within clauses (i), (ii) or (iii) above but for the lapse of time between such transactions, shall, upon the consummation of the last such transaction, be a Transaction.

(b)     Right to Participate.    In the event that ASM and/or ASM Members participate in a Transaction, each Company shall have the right, at its election in its sole discretion, to participate in that Transaction for its entire business or for that part of its business constituting the Company National Clients, on the same terms and conditions and based upon the

same consideration received by ASM and/or ASM Members, as the case may be, in the Transaction.

(c)  Election.  If ASM and/or ASM Members propose to enter into a Transaction, no less than thirty (30) days prior to the closing of the Transaction, ASM shall notify each Company of the proposed Transaction in writing (the "Notice"), and the terms and conditions contained therein, including, without limitation, the consideration being received by ASM and/or the ASM Members, as the case may be. Each Company shall make its own election in writing (the "Election Notice") to participate in the Transaction within fifteen (15) days of receipt of the Notice of the proposed Transaction. In the event that either Company does not indicate in writing, within such time period, its election to participate in the Transaction, it shall be conclusively deemed that such Company has elected not to participate. In the event either Company elects not to participate in the Transaction, or fails to remit its written Election Notice in a timely fashion as described above (which shall not impair the other Company's ability or right to participate in such Transaction), this Agreement shall continue in force and effect until terminated in accordance with the provisions hereof (unless previously terminated pursuant hereto) with respect to the Company that is not participating.

(d)  Lost Client.  If ASM and/or ASM Members participate in a Transaction in which a Company elects, or is deemed to elect, not to participate, and the Transaction consideration consists of property other than cash payable in full at closing, then in that event, if any Company National Client discontinues that Company's contract or servicing in favor of ASM or an ASM Member or the acquiror or successor in the Transaction within a period of one (1) year after the closing of the Transaction, then, in that event that Company shall be compensated as if it had timely elected to participate in the Transaction with respect to such Client on the same terms and conditions as in the Transaction (i.e., that Company shall be compensated by ASM or its successor or assign as though closing of the Transaction with respect to such Client occurred on the date of its loss). There shall be no right to such compensation with respect to any Company National Client lost to ASM, an ASM Member or the acquiror or successor in the Transaction after the date which is one (1) year after the closing of the Transaction.

(e)  Negotiations. Each Company agrees that its right to elect and participate in the Transaction does not extend to the right to participate in negotiations and/or meetings with respect to the Transaction, but only the right and election to participate and the rights expressly set forth in this Agreement.

(f)  Representations and Warranties.  If a Company elects to participate in the Transaction, then: (i) that Company shall not be required to participate in making any representations or warranties or provide any indemnification relative to ASM or any ASM Members (including without limitation, anything relating to their respective businesses, clients, customers, operations or assets) in the Transaction; (ii) that Company shall if requested by ASM make such customary representations and warranties with respect to its business and clients if it elects to participate in the Transaction, and execute such customary documentation with respect to such Company as is required of ASM Members who are participating in such Transaction.

(g)    Assumption of this Agreement. If a Company elects not to participate in a Transaction, then: (i) this Agreement shall continue in force and effect after the Transaction in accordance with its terms; and (ii) none of ASM nor any ASM Members shall consummate such Transaction unless the acquiror or successor in the Transaction expressly agrees in writing in favor of that Company to accept and assume the continued obligations of ASM under this Agreement and to accept and assume all of the obligations under paragraph 2 of the Memorandum as and when due. If a Company elects to participate in a Transaction, then none of ASM nor any ASM Members shall consummate such Transaction unless the acquiror or successor in the Transaction expressly agrees in writing to permit such participation in accordance with the terms and conditions of this Agreement and to accept and assume all of the obligations under paragraph 2 of the Memorandum as and when due.   None of ASM nor any ASM Members shall consummate a Transaction (for purposes of this sentence, the Threshold shall be fifty (50%) percent), unless the acquiror or successor therein expressly agrees in writing in favor of the Companies to accept and assume the continued obligations of ASM under this Agreement and to accept and assume all of the obligations under paragraph 2 of the Memorandum as and when due.

5.    Customer Issues. The Companies will have the right to provide retail services for all Company National Clients to: (a) all retail stores located in each such Company's market area as of the Effective Date, and (b) all retail stores in any market area that are owned by a customer headquartered in each such Company's market area. In addition, each Company shall at its request be entitled to receive the services of ASM Customer Teams, such services to be charged to such Company in the same manner as ASM charges ASM Members for same.

6.    Local or Regional to National Client. ASM shall give notice that it is considering entering into a contract, agreement or relationship with a client with which a Company has a local or regional contract, agreement or relationship and shall first consult with such Company as to any issues or concerns such Company may have relative to such potential change in the client relationship.]

7.    Servicing. During the Term, no Company shall participate or be included in the governance of ASM, but each Company shall: (i) receive prompt written notice from ASM of, and have the right to attend and participate in, all Client meetings involving Company National Clients, (A) as requested by the applicable Company National Client, (B) as mutually agreed upon by ASM and such Company or (C) involving representatives from substantially all ASM markets, and (ii) unless otherwise mutually agreed upon by ASM and such Company, participate in servicing with respect to Company National Clients, including, without limitation as a regional brand development manager, or other functions as requested by such Company National Client. Each Company acknowledges that a Company National Client may, from time to time, request a meeting with ASM national management with respect to one or more market areas, including, without limitation, such Company's market area, which meeting does not include a representative from such market area (a "Top-to-Top Meeting"). Nothing contained in this Section 7 is intended to preclude any Top-to-Top Meeting from occurring, or to give a Company a right to attend any such meeting. Promptly following a Top-to-Top Meeting relating to a Company's market area, ASM shall communicate the results thereof and all material information exchanged thereat applicable to such Company in accordance with Section 8 below.

Notices under this Section 7 shall be given to ASM and/or a Company solely at the addresses set forth in Section 10 below, and shall be given in a reasonably prompt manner in accordance with existing communication methods (e-mail and first class mail) then used by the parties in their normal business activities, and not as otherwise prescribed under Section 10 below.

8.  Information Flow. During the Term, ASM shall include each Company in all ASM information flow relative to all Clients and Customers serviced by such Company to the same extent that such information is provided by ASM to ASM Members (or to ASM Members providing services to such Clients and Customers) (or any persons or entities that such ASM Members may become following a Transaction) generally.

9.  Commissions. During the Term, all commissions received by ASM with respect to Brokerage Services provided by a Company shall be remitted to the Company entitled to such commissions within seven (7) business days of ASM's receipt thereof. In the event that a Client does not provide adequate backup data to enable ASM to determine the exact amount(s) owed to such Company, ASM shall remit to such Company ASM's reasonable estimate of the amount(s) owed to such Company pending a final determination of the exact amount(s) owed.

10.  Notices. All notices and consents to be given or otherwise made to any party to this Agreement shall be in writing and shall be delivered in person, by express overnight courier service, or by facsimile transmission (with a confirming copy sent by U.S. mail, first class, postage prepaid), or by registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

(a)  if to ASM, to Advantage Sales & Marketing, LLC, 19100 Von Karman Avenue, Suite 600, Irvine, CA 06612, Attention Sonny King, CEO. Facsimile: (949) 797-9110. Email sonny@asmsc.com. with a copy to Paul Irby, Esq., 18301 Irvine Blvd., Tustin, CA 92870, Facsimile: (714) 838-5900. Email juris@irbylaw.com

(b)  if to Ferolie, to Ferolie Corporation, 2 Van Riper Road, Montvale, NJ 07645, Attention Daryl Ury Fox. Esq., Facsimile: (201) 782-0878, Email dfox@esm-ny.com, with a copy to Steven E. Siesser, Esq., Lowenstein Sandler, P.C. 65 Livingston Avenue, Roseland, NJ 07068, Facsimile: (973) 597-2507, Email ssiesser@lowenstein.com; and

(c)  if to BTMF, to Buckley Thorne Messina Ferolie LLC, 200 First Avenue, Needham, MA 02194, Attention John R. Buckley, Sr., Chairman, Facsimile: (781) 453-4448, with a copy to Walter Angoff, P.C., Nixon Peabody LLP, 101 Federal Street, Boston, MA 02110, Facsimile: (866) 947-197; Email: wangoff@nixonpeabody.com.

or as otherwise may be specified by a party hereto in a written notice to the other parties given in accordance with this Section 10. All notices shall be considered to be delivered on the day of delivery in the event of delivery in person, five (5) business days after dispatch in the event of registered or certified mail, and on the next succeeding business day in the event of facsimile transmission (with confirmation of receipt and a confirming copy sent by U.S. mail) or overnight courier service.

551207-2                                          10

11.    Entire Agreement; Amendment.    This Agreement and the Memorandum constitute the entire agreement of the parties with respect to the subject matter hereof and thereof.  No provision of this Agreement may be waived except by an instrument in writing executed by the party against whom the waiver is to be effective.  No provision of this Agreement may be amended or otherwise modified except by an instrument in writing executed by ASM and by the Company with respect to which the amendment or modification is to be effective.  No waiver hereunder shall be deemed a waiver of any subsequent breach or default of the same or similar nature.

12.    Governing Law.    This Agreement shall be governed by and construed in accordance with the laws of the State of California, without giving effect to the principles of the conflicts of laws thereof.

13.    Severability.  If any provision of this Agreement shall be held to be illegal, invalid or unenforceable, such illegality, invalidity or unenforceability shall attach only to such provision and shall not in any manner affect or render illegal, invalid or unenforceable any other provision of this Agreement, and this Agreement shall be carried out as if any such illegal, invalid or unenforceable provision were not contained herein.

14.    Certain Rules of Construction.  The titles and subtitles used in this Agreement are for convenience only and are not to be considered in construing or interpreting any term or provision of this Agreement.  This Agreement is the result of negotiations between the parties and shall not be deemed or construed as having been drafted by any one party.

15.    Assignment; Binding Agreement.  Except as otherwise expressly contemplated in this Agreement, including, without limitation, in Section 3 above and by the definition of Permitted Transaction, no Company shall assign this Agreement or any of its rights or obligations hereunder without the prior written consent of ASM.  Except in connection with a Transaction, ASM shall not assign this Agreement or any of its rights or obligations hereunder without the prior written consent of the Companies.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

16.    Relationship of the Parties.  Nothing contained in this Agreement shall be construed as creating any agency, partnership, or other form of joint enterprise between either Company and ASM.  The relationship between the Companies and ASM shall at all times be that of independent contractors.  No party hereto shall have authority to contract for or bind any other in any manner whatsoever.  This Agreement confers no rights upon any party except those expressly granted herein.

17.    Dispute Resolution.  Except as provided below, all claims and disputes between or among the parties hereto, including, without limitation, those arising under this Agreement (including, without limitation, its interpretation, enforcement, enforceability, termination or breach), shall be submitted to arbitration before a single arbitrator in the Chicago, Illinois, under AAA procedural rules and Illinois discovery rules (subject to the arbitrator's sole discretion to

551207-2                                    11

impose limits on such discovery). Notwithstanding the above, any dispute hereunder relating to charges and/or fees contained herein to be paid by or credited to one party from another party shall be finally and fully determined by the decision of an independent Certified Public Accountant (the "CPA") in accordance with this Section 17. If a Company contests any such charges and/or fees, then thatCompany shall deliver notice thereof to ASM (a "Contest Notice") within 10 days after its receipt of the contested charge and/or fee. A Contest Notice given under this Section 17 shall set forth in detail, with arithmetical calculations, those aspects of the claimed charge and/or feewhich the Company contests and deems incorrect. Each of ASM and the Company shall: (a) within 10 days of the date of such Contest Notice, mutually select a CPA, and if they are unable to agree upon a selection within such 10-day period, then each shall select one CPA with whom neither has had a relationship in the past five years, and such CPA shall select a third CPA with whom neither ASM nor the Company has had a relationship in the past five years, to resolve such contest.

18.   Limitation of Liability. UNDER NO CIRCUMSTANCES SHALL ASM BE LIABLE TO THE COMPANIES, NOR SHALL THE COMPANIES BE LIABLE TO ASM, FOR ANY PUNITIVE DAMAGES HEREUNDER.

19.   Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

20.   Representation and Warranty:  Each of the Companies severally represents and warrants to ASM and ASM represents and warrants to the Companies that: (i) they are legally entitled to enter into this Agreement; (ii) they are under no contractual arrangement with any other person or entity under which they are constrained from entering into this Agreement; and (iii) they are not aware of any claims asserted or threatened by any other person or entity against them with respect to their execution of this Agreement.

21.   Binding Agreement:  This Agreement shall be binding upon the parties hereto and their respective successors and assigns.  Each of the parties represents and warrants that the execution and delivery of this Agreement by its respective officer or representative has been duly authorized and that the signature of such officer or representative is binding it.

[signature page follows]

551207-2                                        12

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first above written.

ADVANTAGE SALES & MARKETING, LLC

BY: _____
Sonny King, its CEO, hereunto duly authorized


FEROLIE CORPORATION

BY: _____
Lawrence J. Ferolie, its Chairman, hereunto duly
authorized


BUCKLEY THORNE MESSINA, FEROLIE, LLC

By its Members:

FEROLIE CORPORATION

By: _____
    Lawrence J. Ferolie
    Chairman/CEO

BUCKLEY THORNE MESSINA & ASSOCIATES, INC.

By: _____
    John R. Buckley
    Chairman/CEO

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first above written.

ADVANTAGE SALES & MARKETING, LLC

BY: _____

Sonny King, its CEO, hereunto duly authorized

FEROLIE CORPORATION

BY: _____

Lawrence J. Ferolie, its Chairman, hereunto duly authorized

BUCKLEY THORNE MESSINA, FEROLIE, LLC

By its Members:

FEROLIE CORPORATION

By: _____

Lawrence J. Ferolie
Chairman/CEO

BUCKLEY THORNE MESSINA McDERMOTT & ASSOCIATES, INC.

By: _____

John R. Buckley
Chairman/CEO

551207-2

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first above written.

ADVANTAGE SALES & MARKETING, LLC

BY: _____
        Sonny King, its CEO, hereunto duly authorized

FEROLIE CORPORATION

BY: _____
        Lawrence J. Ferolie, its Chairman, hereunto duly authorized

BUCKLEY THORNE MESSINA, FEROLIE, LLC

By its Members:

FEROLIE CORPORATION

By: _____
        Lawrence J. Ferolie
        Chairman/CEO

BUCKLEY THORNE MESSINA McDERMOTT & ASSOCIATES, INC.

By: _____
        John R. Buckley
        Chairman/CEO

551207-2

# *Exhibit B*

**LOWENSTEIN SANDLER** PC
Attorneys at Law
65 Livingston Avenue
Roseland, New Jersey 07068
973.597.2500
Attorneys for Claimant
Ferolie Corporation

FEROLIE CORPORATION,

               Claimant,

  - vs -

ADVANTAGE SALES & MARKETING, LLC,
ALLIED CAPITAL CORPORATION, and
ADVANTAGE SALES & MARKETING, INC.,

           Respondents.

**AMENDED DEMAND
FOR ARBITRATION AND
STATEMENT OF CLAIMS**

     Claimant Ferolie Corporation ("Ferolie") hereby demands arbitration of the following claims against Respondents Advantage Sales & Marketing, LLC ("ASM"), Allied Capital Corporation ("Allied") and Advantage Sales & Marketing, Inc. ("Allied Sub").

## OVERVIEW OF THE CLAIMS

     1.    Ferolie is a third-generation family-owned business that operates a food brokerage business in the Metropolitan New York market area. A food broker acts as an outsourced sales force for manufacturers of consumer packaged goods. For its manufacturer "clients," a food broker provides sales, marketing and retail merchandising services on a commission basis. Food brokers also provide retail merchandising services to retailers, referred to as "customers," on an hourly or project basis.

     2.    ASM is an international food broker with current annual commission revenues in excess of $700 million. Prior to June 30, 2004, ASM was owned by its members ("Members"), independently-owned companies engaged in the food brokerage business in market areas throughout the United States. On June 30, 2004, all or a majority of ASM's Members merged

10137/3
08/10/04 1589135.03

into and/or sold out to Allied Sub, a company formed by Allied to facilitate its acquisition of ASM (the "Consolidation"). As a result of the Consolidation, Allied, a publicly-traded business development company with a market capitalization of over $3 billion, now holds a majority ownership stake in ASM, through Allied Sub.

3.    ASM and Ferolie are parties to a certain "Affiliation and Services Agreement" dated September 27, 2002 (the "Agreement"), a true copy of which is annexed hereto as <u>Exhibit A</u>. Prior to entering into the Agreement, Ferolie was a Member of ASM. The express intent and purpose of the Agreement was to enable Ferolie, which agreed to convert its ASM membership into a contractual affiliation pursuant to the Agreement, to continue serving shared national clients as if it were still an ASM Member. Ferolie's national clients are clients that Ferolie services in its market area that either have a national contract with ASM or are serviced by ASM or ASM Members in most of the other United States market areas.

4.    At the time the Agreement was entered into, ASM was already in discussions with Allied about a potential acquisition. Since Ferolie would have had a right to participate in such a transaction as a Member of ASM, the Agreement preserved this right by enabling Ferolie to elect to participate in an ASM transaction "on the same terms and conditions" and "based upon the same consideration" as the ASM Members – either for Ferolie's entire business or just the national clients it shared with ASM.

5.    By agreeing to convert its ASM membership into a contractual affiliation pursuant to the Agreement, Ferolie placed its national client relationships in ASM's hands and relied on ASM's good faith in fulfilling this trust. However, ASM breached its obligations virtually from the outset. Indeed, ASM and Allied embarked on a scheme to steal Ferolie's national clients and prevent Ferolie from participating in the Consolidation. The execution of this scheme would unjustly enrich ASM and Allied at Ferolie's expense by enabling ASM and Allied to obtain Ferolie's national clients without having to pay for them in the Consolidation. If ASM and Allied could destroy Ferolie's business in the bargain, they would also succeed in

-2-

eliminating a potential competitor of the post-Consolidation ASM in the important Metropolitan New York market.

6.　To a large extent, ASM and Allied have succeeded in accomplishing their scheme. To date, ASM has taken Ferolie clients that comprised 65% of Ferolie's national client business. ASM also unilaterally declared "terminated" Ferolie's right to participate in the Consolidation. Ferolie protested its exclusion from the Consolidation when Allied Sub applied to the California Department of Corporations ("CDOC") for a permit to issue securities in the Consolidation, as a result of which the CDOC Commissioner refused to proceed with the application until Ferolie's right to participate was resolved. However, ASM and Allied circumvented the CDOC decision and consummated the Consolidation without a CDOC permit and without any adjudication of Ferolie's right to participate.

7.　Ferolie now seeks damages (for the harm the Respondents have caused to Ferolie's business) as well as equitable relief (including a determination that the Consolidation was consummated in violation of the Agreement).

## **FACTUAL BACKGROUND**

**A.　The Affiliation and Services Agreement.**

8.　Ferolie became a Member of ASM as of January 1, 2000. At or about the same time, ASM admitted Ferolie's direct competitor (ASM/NY) as a "parallel member" in Ferolie's market area, promising that ASM would not favor either "parallel member" over the other.

9.　Ferolie (along with several other Members) instituted arbitration proceedings against ASM in early 2001, alleging, among other things, that ASM had improperly favored the "parallel member" and was overcharging for its services. As part of a global settlement of those proceedings in September 2002, Ferolie agreed to convert its ASM membership into a contractual affiliation pursuant to the Agreement, and ASM agreed to pay Ferolie $5.2 million and reduce its service charges to Ferolie from more than $1.5 million annually to $150,000.

10.    Ferolie agreed to fundamentally restructure its relationship with ASM (*i.e.*, convert its membership into a contractual affiliation), and gave up the ability to use the ASM name and branding, in reliance upon ASM's promises as memorialized in the Agreement. ASM's obligations under the Agreement were intended to enable Ferolie to perform for the national clients Ferolie shared with ASM as if Ferolie were still an ASM Member – so that Ferolie could maintain its relationships with its national clients as well as its opportunity to participate in the Consolidation for its national client business.

11.    The Agreement includes numerous provisions that were specifically designed and negotiated to enable Ferolie to continue serving shared national clients as if Ferolie were still an ASM Member, including provisions that:

(a)    Require ASM to provide Ferolie with the same "corporate and sales support" and all other services ASM provides to its Members [Section 2];

(b)    Require ASM to provide Ferolie with all services ASM or its Members provide to its or their clients and customers [Section 2];

(c)    Require ASM to provide Ferolie with any other services (including third-party services) that may be required to enable Ferolie to provide "seamless representation" with that provided to clients and customers by ASM or the ASM Members [Section 2];

(d)    Require ASM to include Ferolie in or promptly and completely inform Ferolie about communications and information flow relating to Ferolie clients and customers [Sections 7 and 8]; and

(e)    Require ASM to consult Ferolie before ASM or an ASM Member may take over any business from Ferolie [Section 6].

12.    The Agreement also includes provisions that were specifically designed and negotiated to enable Ferolie to participate in an ASM transaction (such as the Consolidation) as if Ferolie were still an ASM Member, including provisions that:

(a)    Require ASM to permit Ferolie to elect to participate in a "Transaction" on the "same terms and conditions" and "based upon the same consideration" received by ASM or ASM Members, either for Ferolie's entire business or only its national clients [Section 4(b)];

-4-

(b)    Require ASM to give Ferolie notice of the complete terms and conditions of a proposed "Transaction" and the consideration to be received therein by ASM and the ASM Members [Section 4(c)];

(c)    Require ASM or its acquiror/successor to compensate Ferolie for any Ferolie national client that transfers its business to ASM or any successor entity within one year after consummation of a "Transaction" [Section 4(d)]; and

(d)    Prohibit ASM and the ASM Members from consummating a "Transaction" if Ferolie is denied any of its rights under the Agreement, or if ASM's acquiror or successor fail to accept and assume all of ASM's obligations under the Agreement [Section 4(g)].

13.    Section 17 of the Agreement requires the parties thereto (*i.e.*, ASM and Ferolie) to arbitrate all claims and disputes between them. Under Section 4(g) of the Agreement, pursuant to the Consolidation, Allied and Allied Sub are required to accept and assume all of the obligations of ASM under the Agreement, including the obligation to arbitrate all disputes with Ferolie.

**B.    The Respondents' Scheme To Steal Ferolie's National Clients and Prevent Ferolie from Participating in the Consolidation.**

14.    ASM and Allied continued their acquisition discussions after the Agreement was executed. ASM's national clients were the lynchpin of what ASM was selling to Allied, and ASM and Allied were eager to make sure that the post-Consolidation ASM had exclusive relationships with the ASM national clients. Allied had knowledge of the Agreement and Ferolie's rights thereunder, including Ferolie's right to elect to participate (or not) in the Consolidation. Because Ferolie had negotiated specific protections into the Agreement, there were only two possible scenarios with respect to the national clients serviced by Ferolie: (a) if Ferolie elected to participate in the Consolidation, Allied would have to pay Ferolie for its business, or (b) if Ferolie elected not to participate, the post-Consolidation ASM would have to continue sharing national clients with Ferolie. In order to avoid both these scenarios (since both were undesirable to ASM and Allied), ASM and Allied contrived a scheme that involved stealing Ferolie's national clients and preventing Ferolie from participating in the Consolidation.

15.     In furtherance of this scheme, Allied contacted Ferolie in early 2003 on the pretext of pursuing Ferolie's possible participation in the Consolidation. Allied requested and Ferolie provided a list of Ferolie's national clients, the commission revenues Ferolie earned from each such client, copies of Ferolie's contracts with each such client, copies of Ferolie's financial statements, and information concerning Ferolie's operations.

16.     Included on the list of Ferolie national clients that Ferolie provided to Allied were The Dial Corporation ("Dial"), Church and Dwight ("C&D"), Beech-Nut Nutrition Corporation ("Beech-Nut"), Unilever Bestfoods ("Unilever") and Slimfast Foods ("Slimfast"), from which, collectively, Ferolie earned approximately $12 million in annual commissions.

### ASM Takes Dial's Business From Ferolie

17.     Ferolie was named Dial's "Broker of the Year" for 2001 for both wholesale and retail services -- the first time in Dial's history that a single broker had earned both such awards. At the time of the September 2002 arbitration settlement between Ferolie and ASM, Ferolie represented Dial in the Metropolitan New York market under a contract between Ferolie and Dial. Shortly after the September 2002 settlement, Dial entered into a national contract with ASM, pursuant to which Ferolie continued providing brokerage services in Metropolitan New York. Metropolitan New York was also Dial's top-performing market in 2002.

18.     As a result of ASM's breaches and misconduct, Dial transferred its Metropolitan New York business to ASM/NY effective on April 1, 2003. In its termination letter to Ferolie, Dial stated that it was transferring its Metropolitan New York business to ASM/NY in order to maintain "one national broker contract."

19.     Section 2(g)(X) of the Agreement, however, expressly states that Ferolie can provide brokerage services in the Metropolitan New York market pursuant to an ASM national contract. ASM misrepresented to Dial that Ferolie's change in status from ASM membership to contractual affiliation would mean that Dial would have to manage more than one broker. Dial's misperception that it could not maintain "one national broker contract" while continuing its

relationship with Ferolie was a result of ASM breaches and misrepresentations. ASM also improperly exploited its position by leading Dial to fear that, unless Dial transferred its business from Ferolie to ASM, Dial would risk being resigned by ASM in the event of a competitive manufacturer conflict.

### ASM Takes Church & Dwight's Business From Ferolie

20.     At the time of the September 2002 arbitration settlement, Ferolie represented C&D in Metropolitan New York under a brokerage contract between Ferolie and C&D. Ferolie was named C&D's "Broker of the Year" for 2002.

21.     As a result of ASM's breaches and misconduct, C&D terminated Ferolie's contract effective September 28, 2003. C&D entered into a national contract with ASM, pursuant to which ASM/NY would provide brokerage services in the Metropolitan New York market. In its termination letter to Ferolie, C&D stated that it was transferring its Metropolitan New York business to ASM/NY "in order to maintain a consistency with regard to our national selling strategy."

22.     Various sections of the Agreement require ASM to provide services, communications and information flow to Ferolie to ensure that Ferolie is able to execute a client's national selling strategy in a manner consistent with ASM and the ASM Members. C&D's misperception that it could not "maintain a consistency with regard to [its] national selling strategy" while continuing its relationship with Ferolie was a result of ASM breaches and misrepresentations. ASM also misrepresented to C&D that Ferolie was not allied with ASM but, rather, was an independent broker that could not perform under a national contract with ASM.

### ASM Takes BeechNut's Business From Ferolie

23.     At the time of the September 2002 arbitration settlement, Ferolie represented Beech-Nut in Metropolitan New York under a brokerage contract between Ferolie and Beech-Nut.

-7-

24.     As a result of ASM's breaches and misconduct, BeechNut terminated Ferolie's contract effective October 15, 2003.  BeechNut entered into a national contract with ASM pursuant to which ASM/NY would provide brokerage services in the Metropolitan New York market.

25.     Although BeechNut had previously expressed concern about its Metropolitan New York sales not meeting quota, this issue had been resolved and BeechNut's sales were up at the time BeechNut terminated Ferolie's contract.  ASM induced BeechNut to terminate its contract with Ferolie by wrongfully using the ASM Tri-Net in an intentionally misleading manner to convey the false impression that Ferolie was incapable of providing the same services as ASM/NY.

26.     Section 2 of the Agreement requires ASM to make available to Ferolie all services that ASM or ASM Members provide to its and their clients and customers, including those clients that are shared with Ferolie.  The Tri-Net is an intranet owned and controlled by ASM, use of which the Agreement requires ASM to make available to Ferolie to the same extent as ASM/NY.  BeechNut's misperception that Ferolie could not provide the same services as ASM or ASM Members was a result of ASM breaches and misconduct.

### ASM Takes Unilever Bestfoods' Business From Ferolie

27.     For almost 20 years prior to joining ASM, Ferolie had represented Bestfoods in Metropolitan New York under a brokerage contract between Ferolie and Bestfoods.  In or about January 2002, Bestfoods entered into a national brokerage contract with ASM, pursuant to which Ferolie continued to provide brokerage services to Bestfoods in Metropolitan New York.

28.     As a result of ASM's breaches and misconduct, Bestfoods transferred its Metropolitan New York business to ASM effective August 1, 2004.

29.     In its termination letter to Ferolie, Bestfoods stated that its decision to terminate Ferolie as its Metropolitan New York brokerage service provider was based solely on Bestfoods'

decision to consolidate its business "within the Advantage Sales and Marketing national network." ASM misrepresented to Bestfoods that Ferolie would never be able to work "seamlessly" with ASM because Ferolie was not part of the "ASM network" and would in fact be "completely on the outside" after the Consolidation. Bestfoods' misperception that Ferolie was not part of the "ASM network" was a result of ASM breaches and misconduct.

30.    In or about September 2003, ASM promised Bestfoods that it would be able to electronically access national store-condition information ("retail data") in a single location. ASM arranged that Bestfoods' national retail data would be accessible through ASM's retail reporting database, but ASM failed and refused to permit retail data gathered by Ferolie to be included in ASM's database together with retail data gathered by ASM and ASM Members. ASM also failed and refused to implement any alternative mechanism by which Ferolie's retail data and ASM and ASM Member retail data could be electronically accessible to Bestfoods in a single location.

31.    Section 2 of the Agreement requires ASM to provide Ferolie with such services as may be necessary to enable a client serviced by Ferolie to receive the same services from Ferolie that such client could receive from ASM or an ASM Member. ASM claimed that it was "unable" or "not required" to make Ferolie's retail data and ASM and ASM Member retail data electronically accessible to Bestfoods in a single location. This claim was false; ASM's failure to fulfill its obligations under the Agreement was without legal justification or excuse. Ferolie's inability to make its retail data electronically accessible to Bestfoods in a single location (together with ASM and ASM Member retail data) was a result of ASM's breaches and misconduct.

32.    Section 5 of the Agreement states that Ferolie has the right to provide retail services for all Ferolie national clients to all retail stores located in the Metropolitan New York market. ASM further breached the Agreement by informing Bestfoods that Metropolitan New York retail data would be included in ASM's retail reporting database if Ferolie's retail

-9-

employees were "transferred" to ASM's payroll (*i.e.*, if Ferolie "transferred" its means of servicing the Bestfoods retail business to ASM).

### ASM Takes Slimfast's Business From Ferolie

33.    At the time of the September 2002 settlement, Ferolie represented Slimfast in Metropolitan New York under a brokerage contract between Ferolie and Slimfast.

34.    As a result of ASM's breaches and misconduct, Slimfast terminated Ferolie's contract effective August 1, 2004. Slimfast entered into a national contract pursuant to which ASM would provide brokerage services in the Metropolitan New York market. Slimfast is owned by Bestfoods. In its termination letter to Ferolie, Slimfast stated that its decision to transfer its Metropolitan New York business from Ferolie to ASM was based solely on Bestfoods' decision (*i.e.*, "to consolidate our New York Metro business within the Advantage Sales and Marketing national network").

### ASM's Further Breaches of the Agreement and Misconduct

35.    ASM failed to consult with Ferolie prior to taking Ferolie's business with Dial, C&D, BeechNut, Bestfoods and Slimfast (collectively, the "Terminated National Clients"), in violation of Section 6 of the Agreement.

36.    ASM officers, employees and Members had conversations with Ferolie clients, including but not limited to the Terminated National Clients, concerning services in Ferolie's market area, but failed to include Ferolie in those meetings or provide Ferolie with prompt and complete information about those meetings, in violation of Sections 7 and 8 of the Agreement.

37.    ASM failed to provide Ferolie with the same "corporate and sales support" and other services ASM provided and provides to its Members, in violation of Section 2 of the Agreement. For example, ASM failed to provide Ferolie with information about or permit Ferolie to attend training programs necessary to use certain software provided by ASM to Ferolie under the Agreement. In addition, ASM refused Ferolie's requests to be included among the list

-10-

of ASM Member and affiliate offices displayed on ASM's Tri-Net, notwithstanding that ASM includes on this list at least two other non-Member companies that have agreements with ASM similar to the Agreement.

38.     ASM officers, employees and Members made public and private statements that misrepresented Ferolie's rights and ASM's obligations under the Agreement. For example, ASM erroneously reported to clients, customers and the market at large that Ferolie is and will remain unable to provide "seamless representation" to national clients and customers, and that Ferolie is not and will not be part of the "ASM network."

39.     ASM's Chairman also violated a confidentiality agreement entered into among Allied, ASM and Ferolie, by intentionally and recklessly making premature disclosures about the Consolidation. The fact that Ferolie's rights under the Agreement in connection with such a transaction were not generally known, coupled with ASM's breaches that rendered Ferolie incapable of providing "seamless representation," exacerbated national clients' concerns about Ferolie's ability to meet their needs and expectations following consummation of the Consolidation.

40.     ASM's material breaches of the Agreement and other misconduct described above go to the very core of the agreements between ASM and Ferolie. ASM was well aware that its faithful performance of these agreements was critical to Ferolie's survival, and that Ferolie was relying on ASM's good faith in performing its obligations. However, ASM repeatedly violated its agreements with Ferolie and engaged in other misconduct, with actual malice and with the specific intent to unjustly profit at Ferolie's expense and to destroy Ferolie's business.

C.     **ASM and Allied Block Ferolie's Participation In The Consolidation.**

41.     On December 30, 2003, ASM sent a letter to Ferolie purporting to provide notice of the Consolidation under Section 4(c) of the Agreement. ASM acknowledged that the Consolidation was a "Transaction" in which Ferolie was entitled to elect to participate under

-11-

Section 4(b) of the Agreement, and enclosed a set of draft "model transaction documents." ASM demanded that Ferolie make a binding participation election within 15 days.

42. Ferolie notified ASM and Allied that ASM's December 30, 2003 letter failed to comply with the notice requirements of Section 4(c) of the Agreement.

43. On January 22, 2004, ASM sent a second letter to Ferolie, admitting that certain material information had been omitted from its December 30, 2003 letter. Although ASM's second letter did not cure the defects in its first letter, ASM again demanded that Ferolie make a binding participation election. Allied also sent Ferolie a letter on January 22, 2004, making it clear that ASM and Allied were coordinating their actions.

44. By letter dated February 4, 2004, Ferolie reiterated its position that ASM had not complied with the notice provisions of Section 4(c) of the Agreement, noting that among the many deficiencies was the fact that ASM did not disclose the consideration being received by ASM Members or the complete terms on which Ferolie could participate for its national client business. Ferolie also pointed out that ASM's explanation of the valuation for Ferolie's national clients made it apparent (even with inadequate information) that Ferolie was not being afforded the opportunity to participate on the "same terms and conditions" or for the "same consideration" as ASM Members, in manifest violation of Section 4(b) of the Agreement.

45. Ferolie's February 4, 2004 letter also stated Ferolie's willingness (despite having inadequate information) to participate in the Consolidation for those of its national clients that preferred to be serviced by the consolidated entity, provided Ferolie received the consideration therefor required under the Agreement. ASM knew or should have known that Ferolie's letter did not constitute a rejection of Ferolie's participation in the Consolidation, because ASM knew and was on notice that it had never provided Ferolie with proper notice under Section 4(c) of the Agreement, nor had ASM offered Ferolie the Consolidation consideration to which Ferolie was entitled under Section 4(b) of the Agreement. Nonetheless, ASM informed Ferolie on

-12-

February 5, 2004 that Ferolie's February 4, 2004 letter "terminated Ferolie's ability to participate in the Transaction."

**D. ASM and Allied Circumvent the California Department of Corporations Decision, and Secretly Consummate the Consolidation in Violation of the Agreement.**

46. On or about December 22, 2003 (unbeknownst to Ferolie at the time), Allied Sub filed an application with the CDOC (the "Application") for a permit to issue securities in connection with the Consolidation. In order for such a permit to be issued, the CDOC would first have to hold a hearing to determine that the terms and conditions of the Consolidation were "fair, just and equitable." When Ferolie finally became aware of the Application in or about February 2004, Ferolie sought to participate in the CDOC fairness hearing process, asserting that it had not received proper notice of the Consolidation pursuant to Section 4(c) of the Agreement and was improperly denied its right to participate pursuant to Section 4(b).

47. On April 19, 2004, after considering various briefs and submissions, the Commissioner of the CDOC issued a decision declining even to hold a fairness hearing on the Application until Ferolie's right to participate in the Consolidation was resolved.

48. By the time Ferolie first learned of the CDOC Commissioner's decision in mid-May (although the CDOC omitted to copy Ferolie, on its transmittal of the decision neither ASM nor Allied thought it necessary to provide a copy to Ferolie), Allied Sub had withdrawn the Application, and ASM and Allied had already contrived to consummate the Consolidation without a CDOC permit and without any adjudication of Ferolie's right to participate.

49. To eliminate the need for a CDOC permit (or SEC registration, the only alternative mechanism provided for in the "model transaction documents"), ASM and Allied cunningly agreed to modify the terms, structure and/or certain elements of the Consolidation. However, since this modification would by definition constitute a new "Transaction," the Agreement required that Ferolie be given notice of and an opportunity to participate in the modified Consolidation.

-13-

50.     To avoid providing Ferolie with such notice, and/or in retaliation for Ferolie's intervention in the CDOC hearing process, ASM, in concert with Allied and Allied Sub, unilaterally deemed the Agreement "terminated," without basis and in violation of Section 3 of the Agreement.

51.     Specifically, ASM sent Ferolie a purported "notice of breach" claiming that **Ferolie** had somehow breached the Agreement by (a) holding itself out as an "affiliate" of ASM (notwithstanding Ferolie's status under the "*Affiliation* and Services Agreement"), (b) communicating directly with an ASM third-party vendor in an effort to obtain the "seamless" retail reporting services that ASM refused to provide (notwithstanding that ASM had instructed Ferolie to contact the vendor directly for such purpose), and (c) by interfering with Allied Sub's CDOC Application (notwithstanding that, in so doing, Ferolie had properly exercised its First Amendment right to petition a government body).

52.     ASM and Allied consummated the Consolidation on or about June 30, 2004 – without providing notice to Ferolie, without affording Ferolie an opportunity to elect to participate, without compensating Ferolie for any of the business improperly gained by ASM at Ferolie's expense through breaches of the Agreement and other misconduct, and without any adjudication of Ferolie's contract rights – in blatant circumvention of the CDOC decision and in violation of the Agreement.

53.     ASM consummated the Consolidation even though Allied never assumed the Agreement and all of ASM's other obligations under the September 2002 arbitration settlement, in violation of Section 4(g) of the Agreement which requires such assumption as a pre-condition to consummation of the Consolidation.

E.      **ASM's Baseless "Termination" of the Agreement Further Harms Ferolie.**

54.     Even if Ferolie elected *not* to participate in the Consolidation (as ASM and Allied contend is the case), then Allied and Allied Sub, as ASM's acquiror and successor, are required to: (a) accept and assume the Agreement and all of ASM's obligations under the September

-14-

2002 arbitration settlement (including the $4.3 million balance remaining on the $5.2 million settlement), and (b) compensate Ferolie for any Ferolie national client that transfers its business to the consolidated entity within one year after the consummation, as if Ferolie had participated in the Consolidation for such "Lost Client."

55. Under this "Lost Client" provision of the Agreement, Ferolie is entitled to compensation for its losses of Bestfoods and Slimfast, which transferred their business from Ferolie to ASM *after* the consummation of the Consolidation. However, Allied and Allied Sub failed to deliver the mandatory assumption to Ferolie, and failed to compensate Ferolie for Unilever and Slimfast..

56. Ferolie's ability to provide "seamless representation" and the safeguard mandatory assumption and "Lost Client" protections are crucial to Ferolie's ability to maintain its business in the post-Consolidation transition period.

57. The Respondents failed and refused to arbitrate the above-described disputes with Ferolie, as required under Section 17 of the Agreement, as a result of which Ferolie was forced to engage in costly litigation to enforce its rights under the Agreement.

### SUMMARY OF THE RESPONDENTS' MISCONDUCT AND THE HARM CAUSED TO FEROLIE

58. As set forth above, the Respondents have, either individually or collectively:

(a) Failed to provide Ferolie with services necessary to enable Ferolie to provide "seamless representation" to shared national clients, as required under Section 2 of the Agreement, and exploited the consequences of their own misconduct by informing clients that Ferolie was unable to provide "seamless representation" with ASM and its Members;

(b) Failed to provide Ferolie with information and other services necessary to properly serve its clients, as required under Sections 7 and 8 of the Agreement;

(c) Failed to consult with Ferolie prior to taking over Ferolie's business, as required under Section 6 of the Agreement;

(d) Created and perpetuated the false impression among Ferolie's clients and

-15-

the public that Ferolie was, is or will be unable to provide proper services to national or other clients after consummation of the Consolidation;

(e)    Wrongfully induced Ferolie's clients to transfer their business to ASM and/or ASM/NY;

(f)    Failed to provide Ferolie with proper notice of the Consolidation, as required under Section 4(c) of the Agreement;

(g)    Improperly denied Ferolie its right to participate in the Consolidation on the same terms and conditions and based on the same consideration received by ASM and the ASM Members, as required under Section 4(b) of the Agreement;

(h)    Deemed the Agreement "terminated" without basis, in violation of Section 3(b) of the Agreement;

(i)    Consummated the Consolidation without giving Ferolie notice of and the opportunity to participate therein, in violation of Section 4(b) and 4(c) of the Agreement;

(j)    Consummated the Consolidation without an express assumption by Allied and/or Allied Sub of the Agreement and all of ASM's obligations under the September 2002 settlement of the prior arbitration proceedings, in violation of Section 4(g) of the Agreement;

(k)    Consummated the Consolidation without an adjudication of Ferolie's right to participate, in contravention of the decision of the CDOC:

(l)    Failed to compensate Ferolie for Ferolie's national clients that are now being serviced by the post-Consolidation entity; and

(m)    Failed and refused to arbitrate Ferolie's disputes, in violation of Section 17 of the Agreement.

59.    Ferolie requested the Respondents to cure their breaches and correct their misrepresentations and misconduct, but the Respondents refused. Instead, the Respondents exploited the consequences of their misconduct, causing substantial harm to Ferolie.

60.    As a result of the Respondents' aforesaid material breaches and tortious misconduct, Terminated National Clients that represented approximately 65% of Ferolie's national client business have already terminated their business relationships with Ferolie, in favor of ASM and/or ASM/NY, unjustly enriching the Respondents at Ferolie's expense. This

-16-

caused immediate monetary loss to Ferolie and further forced Ferolie to lay off approximately 25% of its workforce.

61. As a result of the Respondents' aforesaid material breaches and tortious misconduct, Ferolie's relationships with its remaining national clients, including Bumble Bee, J.O. Butler, Del Pharmaceuticals, Eagle Family Foods, Johnson & Johnson (including Neutrogena), Marzetti, Masterfoods (including Seeds of Change), McCormick, Phillips, Revlon, S.C. Johnson, Sunbeam and SunMaid (collectively, "Remaining National Clients") have been impaired. Ferolie's national clients receive national services from Ferolie through its affiliation with ASM. ASM's wrongful denial of services to Ferolie, combined with ASM's misrepresentations and the Respondents' deliberate and wrongful prevention of Ferolie from participating in the Consolidation, have created doubt and confusion in the market, and specifically in the minds of Ferolie's Remaining National Clients, concerning Ferolie's ability to deliver "seamless representation" and adequate services.

62. As a result of the Respondents' aforesaid material breaches and tortious misconduct, Ferolie was forced to make significant structural changes to its operations, including closing a division (SGA/Houck) that was originally established to enable Ferolie to represent clients whose products gave rise to a conflict with products sold by other Ferolie clients. This will impair, if not entirely eliminate, Ferolie's ability to take on such clients in the future.

63. As a result of the Respondents' aforesaid material breaches and tortious misconduct, including the workforce reductions and structural reorganization necessitated by Ferolie's loss of the Terminated National Clients, Ferolie's reputation has been injured. Ferolie's remaining clients, including but not limited to the Remaining National Clients, as well as prospective new clients, have questioned Ferolie's ability to provide adequate service and even Ferolie's continued viability.

64. Further client losses would greatly magnify the harm to Ferolie's business by substantially impairing Ferolie's ability to maintain the "critical mass" necessary to properly

service its remaining clients and customers, resulting in further workforce reductions and structural adjustments, and further injury to Ferolie's business and reputation.

65. As a result of the Respondents' aforesaid material breaches and tortious misconduct, Ferolie was wrongfully prevented from participating in the Consolidation for its Terminated National Clients and such of its Remaining National Clients as prefer to be serviced by a consolidated entity, thereby preventing Ferolie from obtaining the economic and other benefits of such participation.

66. As a result of the Respondents' aforesaid material breaches and tortious misconduct, Ferolie was wrongfully prevented from obtaining "Lost Client" compensation under Section 4(d) of the Agreement for Bestfoods and Slimfast, and for any of its Remaining National Clients that hereafter transfer their business from Ferolie to ASM, Allied and/or Allied Sub.

## FIRST COUNT

### BREACH OF CONTRACT
### (Respondents' Breach of the Agreement)

67. Ferolie incorporates Paragraphs 1 through 66 as if set forth at length herein.

68. Ferolie and ASM are the original parties to the Agreement.

69. Pursuant to the Consolidation, Allied and Allied Sub are required to accept and assume the obligations of ASM under the Agreement.

70. The Respondents materially breached their obligations under the Agreement as described hereinabove.

71. As a proximate result of the Respondents' material breaches of the Agreement, as hereinabove described, Ferolie has been harmed as hereinabove set forth.

**SECOND COUNT**

**TORTIOUS INTERFERENCE WITH
CONTRACTUAL RELATIONS
(Respondents' Interference With Ferolie's Contractual Relations With Its Clients)**

72.     Ferolie incorporates Paragraphs 1 through 66 as if set forth at length herein.

73.     Ferolie had contracts with its Terminated National Clients and has contracts with its remaining clients, including but not limited to its Remaining National Clients, pursuant to which Ferolie had and has an obligation to provide brokerage services to such clients -- including but not limited to "seamless representation" for its Terminated National Clients and its Remaining National Clients -- and pursuant to which Ferolie was and is entitled to receive compensation for its services.

74.     The Respondents had specific knowledge of Ferolie's aforesaid contracts with its clients, and of Ferolie's aforesaid obligations and rights under such contracts.

75.     As described hereinabove, the Respondents knowingly made false representations about Ferolie, Ferolie's business and Ferolie's rights under the Agreement, intentionally failed and refused to comply with obligations they knew they had under the Agreement, and otherwise intentionally acted or failed to act so as to induce a termination, breach or disruption of Ferolie's performance of its contractual obligations to its clients and Ferolie's contractual relations with its clients.

76.     The Respondents' aforesaid actions and conduct were without legal justification or excuse, and were done with actual malice and with the intent to destroy Ferolie's business and unjustly profit at Ferolie's expense.

77.     The Respondents' aforesaid tortious misconduct proximately caused actual termination, breach or disruption in Ferolie's performance of its contractual obligations to its clients and Ferolie's contractual relations with its clients.

-19-

78.     As a proximate result of the Respondents' tortious misconduct as hereinabove described, Ferolie has been harmed as hereinabove set forth.

## THIRD COUNT

### TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
**(Respondents' Interference With Ferolie's Business Relationships With Its Clients And Ferolie's Prospects To Obtain New Clients And Business Relationships)**

79.     Ferolie incorporates Paragraphs 1 through 66 as if set forth at length herein.

80.     Ferolie had existing business relationships with its Terminated National Clients and has existing business relationships with its remaining clients, including but not limited to its Remaining National Clients, pursuant to which Ferolie has earned commissions and obtained other economic advantages, and from the continuation of which Ferolie reasonably expected or expects to earn additional commissions and obtain other economic advantages.

81.     In addition, Ferolie had likely prospects to obtain new clients and business relationships from which Ferolie reasonably expected to earn commissions and obtain other economic advantages.

82.     The Respondents had specific knowledge of Ferolie's aforesaid business relationships with its existing clients and of Ferolie's aforesaid prospects to obtain new clients and business relationships, and also had knowledge of the economic advantages Ferolie derived and reasonably expected to derive from such relationships.

83.     As described hereinabove, the Respondents knowingly made false representations about Ferolie, Ferolie's business and Ferolie's rights under the Agreement, intentionally failed and refused to comply with obligations they knew they had under the Agreement, and otherwise intentionally acted or failed to act so as to interfere with and induce a disruption of Ferolie's relationships with its clients and its prospects to obtain new clients and business relationships.

84.     The Respondents' aforesaid actions and conduct were without legal justification or excuse, and were done with actual malice and with the intent to destroy Ferolie's business and unjustly profit at Ferolie's expense.

85.     The Respondents' aforesaid tortious misconduct proximately caused actual interference with and disruption in Ferolie's relationships with its clients and its prospects to obtain new clients and business relationships.

86.     As a proximate result of the Respondents' tortious misconduct as hereinabove described, Ferolie has been harmed as hereinabove set forth.

## FOURTH COUNT

### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Allied's And Allied Sub's Interference With Ferolie's Contractual Relations with ASM)

87.     Ferolie incorporates Paragraphs 1 through 66 as if set forth at length herein.

88.     At all times relevant hereto, Ferolie had a contractual relationship with ASM under the Agreement.

89.     At the time Allied and Allied Sub engaged in the misconduct hereinabove set forth, Allied and Allied Sub had specific knowledge of Ferolie's rights and ASM's obligations under the Agreement.

90.     As described hereinabove, Allied and Allied Sub knowingly made false representations about Ferolie, Ferolie's business and Ferolie's rights under the Agreement, conspired with ASM and joined in ASM's scheme to intentionally fail and refuse to comply with obligations that Allied and Allied Sub knew ASM had under the Agreement, and otherwise intentionally acted or failed to act so as to induce a breach or disruption of ASM's performance of its contractual obligations to Ferolie under the Agreement.

-21-

91.     Allied's and Allied Sub's aforesaid actions and conduct were without legal justification or excuse, and were done with actual malice and with the intent to destroy Ferolie's business and unjustly profit at Ferolie's expense.

92.     Allied's and Allied Sub's aforesaid tortious misconduct proximately caused actual breach or disruption in ASM's performance of its contractual obligations to Ferolie under the Agreement and in Ferolie's contractual relations with ASM.

93.     As a proximate result of Allied's and Allied Sub's aforesaid tortious misconduct as hereinabove described, Ferolie has been harmed as hereinabove set forth.

## PRAYER FOR RELIEF

Based upon the foregoing, Ferolie hereby demands an award:

(1)     Declaring that:

    (a)     the Agreement was not properly terminated by ASM and shall continue in force and effect;

    (b)     ASM failed to provide Ferolie with proper notice of the Consolidation in any of its various proposed forms or structures;

    (c)     the Respondents wrongfully denied Ferolie its contractual right to participate in the Consolidation;

    (d)     the Respondents consummated the Consolidation in violation of the Agreement;

    (e)     the consummation of the Consolidation is null and void;

    (f)     if the Consolidation is permitted to remain consummated, then:

        (i)     Allied and Allied Sub are ASM's acquiror and successor under the Agreement; and

        (ii)    all of ASM's obligations under the September 2002 arbitration settlement (including but not limited to he Agreement) are binding on Allied and Allied Sub;

(2)     Enjoining the Respondents from further consummating the Consolidation or engaging in any other "Transaction" (as defined in Section 4(a) of the Agreement) unless and until the notice provisions and all other relevant provisions of the

Agreement have been satisfied, and Ferolie is able to participate in the Consolidation, or any other such "Transaction," in accordance with the applicable provisions of the Agreement;

(3)     Ordering the Respondents to:

    (a)     issue a public statement in a form satisfactory to Ferolie and the Arbitrator:

        i) retracting and correcting statements made by ASM officers and employees regarding Ferolie's affiliation with ASM; and

        ii) affirmatively apprising all clients and customers represented or serviced by Ferolie of Ferolie's right to continue as an affiliate of ASM, Allied Sub and Allied, and to continue receiving and providing brokerage services that are "seamless" with those provided by ASM or ASM's successor or acquiror; and

    (b)     thereafter cease and desist from making any public statements, or private statements to third parties, of any kind about Ferolie, Ferolie's business, Ferolie's ability to perform brokerage services, or its status in relation to the Consolidation or the consolidated entity created by the transaction;

(4)     Specifically enforcing the Respondents' obligations under the Agreement, including but not limited to compelling the Respondents to:

    (a)     provide Ferolie with all Fixed Fee Services;

    (b)     provide Ferolie with complete and timely information concerning, and an opportunity to participate in, any and all services ASM obtains for itself or offers to clients and/or customers;

    (c)     provide Ferolie with such Menu Services as Ferolie has elected or shall elect to receive;

    (d)     provide Ferolie with all services necessary to enable Ferolie to provide "seamless representation" to shared clients, including but not limited to "seamless" retail reporting services;

    (e)     include Ferolie in all communications and meetings, and provide complete and timely information flow, concerning clients and customers Ferolie services; and

    (f)     compensate Ferolie, pursuant to Section 4(d) of the Agreement, for any Ferolie national clients that transferred or transfer their business from Ferolie to ASM or its successor or acquiror.

(5)     Appointing a receiver, custodian or other appropriate third party to monitor and oversee the Respondents' compliance with the Agreement and all of ASM's obligations pursuant to the September 2002 arbitration settlement and any award issued in this arbitration;

(6)     Awarding compensatory damages, including all direct and consequential damages resulting from the Respondents' misconduct;

(7)     Awarding attorneys' fees, costs and interest; and

(8)     Awarding such other and further legal and equitable relief as the Arbitrator deems just and proper.

## RESERVATION OF RIGHTS

This demand is issued without prejudice and with reservation of all rights, claims, defenses and causes of action which may otherwise be lawfully reserved and available to Ferolie. This demand may be supplemented and/or amended pursuant to applicable law.

LOWENSTEIN SANDLER PC
Attorneys at Law
65 Livingston Avenue
Roseland, New Jersey  07068
973.597.2500
973.597.2400 (fax)
dharris@lowenstein.com

Attorneys for Claimant
Ferolie Corporation

By:  _____
        David L. Harris

Dated:  August 10, 2004

-24-

# *Exhibit C*

# LOWENSTEIN SANDLER PC
### Attorneys at Law

DAVID L. HARRIS
*Member of the Firm*

*Tel 973.597.2378  Fax 973.597.2379*
*dharris@lowenstein.com*

August 10, 2004

**VIA FEDEX**

| | | |
|---|---|---|
| Advantage Sales & Marketing, LLC | Allied Capital Corporation | Advantage Sales & Marketing, Inc. |
| Attn: Sonny King, CEO | Attn: John D. Shulman | Attn: John D. Shulman |
| 19100 Von Karman Avenue | 1919 Pennsylvania Avenue | 1919 Pennsylvania Avenue, NW |
| Suite 600 | Washington, D.C. 20006 | Washington, D.C. 20006 |
| Irvine, California 06612 | | |

**Re:    Ferolie Corporation v. Advantage Sales & Marketing, LLC, et al.**

Gentlemen:

Enclosed please find Ferolie Corporation's Amended Arbitration Demand dated August 10, 2004, served in accordance with the notice provisions of Section 10 of the Affiliation and Services Agreement, dated September 27, 2002, and the procedural rules of the American Arbitration Association. By copy of this letter, I am also serving a copy of the enclosed Arbitration Demand upon your respective attorneys.

Based on your responses to the July 26, 2004 letter of my colleague, Bryan Blaney, Esq., you have indicated your collective refusal to arbitrate the current dispute with Ferolie Corporation in Chicago, Illinois (or any other arbitration forum). Ferolie hereby demands that all parties proceed to arbitration as required under the arbitration provision of Section 17 of the Affiliation and Services Agreement. Otherwise, Ferolie will have no choice but to file a petition to compel arbitration in the United States District Court, Northern District of Illinois pursuant to Section 4 of the Federal Arbitration Act, 9 U.S.C. § 4.

Very truly yours,

David L. Harris

10137/3
08/10/04 1591215.01

Enclosure

Advantage Sales & Marketing, LLC             August 10, 2004
Allied Capital Corporation
Advantage Sales & Marketing, Inc.
Page 2


cc:     William A. Despo, Esq. (via FedEx; w/encl.)
        Donald M. Carley, Esq. (via FedEx; w/encl.)
        Richard Murphy, Esq. (via FedEx; w/encl.)
        Frederick Brown, Esq. (via FedEx; w/encl.)



Advantage Sales & Marketing, LLC
Allied Capital Corporation
Advantage Sales & Marketing, Inc.
Page 3

August 10, 2004

bcc:    Daryl U. Fox, Esq. (via E-mail; w/encl.)
        Steven E. Siesser, Esq. (w/encl.)
        Steven M. Hecht, Esq. (w/encl.)
        Michael J. Hahn, Esq. (w/encl.)
        Jason E. Halper, Esq. (w/encl.)



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DISTRICT**

FEROLIE CORPORATION,                    )
                                        )
                Petitioner,          )
                                        )
      v.                                )       No.
                                        )
ADVANTAGE SALES & MARKETING, LLC,       )
ALLIED CAPITAL CORPORATION and          )
ADVANTAGE SALES & MARKETING, INC.,      )
                                        )
                Respondents.         )

**BRIEF IN SUPPORT OF PETITIONER FEROLIE**
**CORPORATION'S PETITION TO COMPEL ARBITRATION**

Mark P. Miller (06191128)
**WILDMAN HARROLD ALLEN & DIXON LLP**
225 W. Wacker Drive, Suite 3000
Chicago, Illinois 60606
312.201.2000

**Of Counsel:**

David L. Harris
Steven M. Hecht
**LOWENSTEIN SANDLER PC**
Attorneys at Law
65 Livingston Avenue
Roseland, New Jersey 07068
973.597.2500

Attorneys for Petitioner
Ferolie Corporation

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ..................................................................................................................... 1

FACTUAL BACKGROUND ..................................................................................................... 3

    A.    The Affiliation and Services Agreement. ............................................................... 3

    B.    Respondents' Blatant Disregard of Ferolie's Right to Participate in the Consolidation Under the Agreement. ..................................................................... 3

    C.    Respondents Circumvent the California Department of Corporations Decision, and Consummate the Consolidation in Violation of the Agreement. ........................................................................................................... 5

    D.    The Arbitration Provision and Respondents' Refusal to Arbitrate. ......................... 6

    E.    ASM's and ASM Inc.'s Pending California Actions. .............................................. 9

ARGUMENT ........................................................................................................................... 11

THE DISPUTE BETWEEN FEROLIE AND RESPONDENTS IS SUBJECT TO THE FEDERAL ARBITRATION ACT AND MUST BE ARBITRATED. ............................... 11

    A.    ASM's Allegations Of Waiver Are For The Arbitrator to Decide And, In Any Event, Ferolie Has Not Waived Its Right to Arbitrate. ............................... 12

    B.    Allied Capital and ASM Inc. Have Assumed ASM's Obligations Under The Agreement, Including Its Obligation to Arbitrate Against Ferolie. ................. 14

CONCLUSION ........................................................................................................................ 15

## TABLE OF AUTHORITIES

**Cases**                                                                          **Page**

*Dean Witter Reynolds. Inc. v. Byrd*, 470 U.S. 213 (1985)........................................9, 11

*Fyrnetics Ltd. v. Quantum Group, Inc.*, 2001 WL 40900, 99-CV-4704
    (N.D. Ill. Jan. 11, 2001) ..........................................................................14

*Gingiss Int'l, Inc. v. L &H Tuxes, Inc.*, 2002 WL 1553289, 01-CV-7272
    (N.D. Ill. July 15, 2002).........................................................................11

*Halim v. The Great Gatsby's Auction Gallery*, 2004 WL 434191, 03-CV-8414
    (N.D. Ill. March 5, 2004) ........................................................................13

*Hoffman v. Deloitte & Touche, LLP*, 143 F. Supp. 2d 995 (N.D. Ill. 2001)...................14

*Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79 (2002)........................................12

*International Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*,
    206 F.3d 411 (4th Cir. 2000) ..................................................................14

*Ivax Corp. v. B. Braun of America, Inc.*, 286 F.3d 1309 (11th Cir. 2002) ....................13

*J.J. Ryan & Sons v. Rhode Poulenc Textile, S.A.*, 863 F.2d 315 (4th Cir. 1988)..............11, 12

*Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907 (7th Cir. 1999).............11

*Kim v. Colorall Technologies, Inc.*, 2000 WL 1262667 (N.D. Cal. Aug. 18, 2000)...........11

*Marchetto v. DeKalb Genetics Corp.*, 711 F. Supp. 936 (N.D. Ill. 1989).....................14

*McAlister Brothers, Inc. v. A & S Transportation Co.*, 621 F.2d 519 (2d Cir. 1980) .................15

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lauer*, 49 F.3d 323 (7th Cir. 1995) ...................11

*Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983) ..........................11

*Nat'l American Ins. Co. v. Transamerica Occidental Life Ins. Co.*,
    328 F.3d 462 (8th Cir. 2003) ..................................................................12

*Williams v. Katten, Muchin & Zavis*, 837 F. Supp. 1430 (N.D. Ill. 1993) ....................13

**Statutes**

9 U.S.C. § 4...........................................................................................*Passim*

Petitioner Ferolie Corporation ("Ferolie") respectfully submits this brief in support of its petition to compel arbitration against Respondents Advantage Sales & Marketing, LLC ("ASM"), Allied Capital Corporation ("Allied Capital") and Advantage Sales & Marketing, Inc. ("ASM Inc.") (collectively, "Respondents").

## **INTRODUCTION**

This is an application to compel arbitration pursuant to Section 4 of the Federal Arbitration Act ("FAA"). The required showing under the FAA to compel arbitration is: (i) the existence of a dispute between the parties, (ii) an arbitration agreement covering that dispute, (iii) that interstate commerce is implicated by the parties' underlying contract, and (iv) the failure, neglect or refusal of the respondents to arbitrate the dispute. As set forth below, all of these requirements have been met in this case, and thus arbitration must be compelled.

Ferolie is a third generation family-owned "food brokerage" business operating in the Metropolitan New York area, serving as an independent sales and marketing agent for manufacturers of consumer packaged goods and retailers. Ferolie and ASM (a national food broker) are no strangers to arbitration. Indeed, in September 2002, after *ASM* had demanded that the parties arbitrate a prior dispute pursuant to an arbitration provision in their first contract, Ferolie and ASM entered into a global settlement on the eve of arbitration in which Ferolie agreed to convert its membership in ASM into a contractual affiliation pursuant to an Affiliation and Services Agreement (the "Agreement"), and ASM agreed to pay Ferolie $5.2 million and reduce its service charges to Ferolie from more than $1.5 million annually to $150,000. The Agreement provided, among other things, that Ferolie could continue serving the national clients it shared with ASM and participate in certain transactions affecting ASM as if Ferolie were still an ASM member. Significantly, similar to the parties' first contract, the Agreement also contained an extremely broad arbitration provision wherein the parties agreed that "all claims and disputes . . . shall be submitted to arbitration before a single arbitrator in [] Chicago, Illinois."

From the outset of the Agreement, however, ASM (as it had done before) wantonly ignored the terms of its contract with Ferolie. Indeed, ASM and its future acquiror, Allied Capital, embarked on a scheme to disregard Ferolie's rights under the Agreement, purloin Ferolie's national clients, and prevent Ferolie from participating in a "roll-up" transaction, or consolidation, of ASM's members (the "Consolidation") -- in which the ASM members and their individual ownership interests in ASM were acquired by Allied Capital for $257 million through its subsidiary formed for the purpose of the acquisition, ASM Inc. Although Ferolie had purposely negotiated the right to participate in the Consolidation under the Agreement, that right was abrogated when Allied Capital and its subsidiary, ASM Inc., encouraged and/or otherwise caused ASM to fail to comply with the notice provisions under the Agreement for such a transaction, and when ASM unilaterally decided that Ferolie's contractual right to participate in the Consolidation had somehow been "terminated." Thus, without affording Ferolie an opportunity to elect to participate, the Respondents consummated the Consolidation on or about June 30, 2004. Based on Ferolie's inability to participate in the Consolidation, and ASM's other breaches of the Agreement, roughly 65% of Ferolie's national clients have terminated their business relationships with Ferolie in favor of ASM.

Accordingly, a dispute arising under the Agreement plainly exists. Notwithstanding the arbitration provision in the Agreement mandating that "all claims and disputes" be arbitrated in Chicago, ASM has steadfastly refused to arbitrate the current dispute with Ferolie in Chicago or any other non-judicial forum. Likewise, Allied Capital and ASM Inc. have refused to arbitrate, even though the Agreement expressly required them to assume ASM's obligations under the Agreement -- including its obligation to arbitrate its disputes with Ferolie -- prior to completing the Consolidation. Thus, as a result of the Consolidation, either by operation of law or contract, Allied Capital and ASM Inc. have become the successors and acquirors of ASM. Each had knowledge of the Agreement before the Consolidation and, consequently, they are bound by ASM's obligations under the Agreement, including, without limitation, the obligation to arbitrate. Ferolie's petition for an order compelling arbitration must therefore be granted.

**FACTUAL BACKGROUND**

A.    **The Affiliation and Services Agreement.**

On or about September 27, 2002, Ferolie and ASM entered into the Agreement, the express purpose of which was to enable Ferolie to continue serving the national clients it shared with ASM as if it were still an ASM member. *See* Petition to Compel Arbitration, dated August 17, 2004 ("Pet."), ¶ 8. Significantly, because ASM was already in discussions with Allied Capital about a potential acquisition at the time the Agreement was entered into, Section 4 of the Agreement included provisions that were specifically negotiated to enable Ferolie to participate in certain transactions affecting ASM or its members (such as the Consolidation). *Id.* ¶ 9. Since Ferolie would have had a right to participate in such a transaction as a member of ASM, Section 4(b) of the Agreement preserved this right by enabling Ferolie to elect to participate in such an ASM transaction "on the same terms and conditions" and "based upon the same consideration" received by ASM and/or its members. *Id.*, Ex. A § 4.

B.    **Respondents' Blatant Disregard of Ferolie's Right to
Participate in the Consolidation Under the Agreement.**

Despite the plain terms of the Agreement, ASM breached its obligations to Ferolie under the Agreement virtually from the outset. *Id.* ¶ 10. Shortly after the Agreement was entered into, ASM and Allied Capital embarked on a scheme to take away Ferolie's national clients and prevent Ferolie from participating in the Consolidation. *Id.* Specifically, Allied Capital and its subsidiary, ASM Inc., encouraged and/or otherwise caused ASM to (i) violate Section 4(c) of the Agreement by failing to provide Ferolie with proper notice of the Consolidation; (ii) improperly demand that Ferolie make an election to participate in the Consolidation, despite knowing that inadequate information had been provided to Ferolie for it to make such an election; and (iii) violate Section 4(b) of the Agreement by improperly denying Ferolie the right to participate in the Consolidation on the same terms and conditions as ASM's members. *Id.* ¶ 11.

On December 30, 2003, ASM sent a letter to Ferolie purporting to provide notice of the Consolidation under Section 4(c) of the Agreement. *Id.* ¶ 12. ASM acknowledged in that letter

that the Consolidation was a "Transaction" in which Ferolie was entitled to elect to participate under Section 4(b) of the Agreement, and enclosed a set of draft "model transaction documents." *Id.* ASM also demanded that Ferolie make a binding participation election within 15 days. *Id.* In response, Ferolie notified ASM and Allied Capital that ASM's December 30, 2003 letter failed to comply with the notice requirements of the Agreement. *Id.* ¶ 13. Thus, on January 22, 2004, ASM sent a second letter to Ferolie, admitting that certain material information had been omitted from its December 30, 2003 letter. *Id.* Although ASM's second letter did not cure the defects in its first letter, ASM again demanded that Ferolie make a binding participation election. *Id.* Tellingly, Allied Capital also sent Ferolie a letter on January 22, 2004 demanding same, and making it clear that ASM and Allied Capital were coordinating their actions. *Id.*

By letter dated February 4, 2004, Ferolie reiterated its position that ASM had not complied with the notice provisions of Section 4(c) of the Agreement, noting that among the many deficiencies was the fact that ASM did not disclose the consideration being received by ASM's members or the complete terms on which Ferolie could participate for its national client business. *Id.* ¶ 14. Ferolie also pointed out that ASM's explanation of the valuation for Ferolie's national clients made it apparent (even with inadequate information) that Ferolie was not being afforded the opportunity to participate on the "same terms and conditions" and for the "same consideration" as ASM's members, in manifest violation of Section 4(b) of the Agreement. *Id.*

Ferolie's February 4, 2004 letter also stated its willingness (despite having inadequate information) to participate in the Consolidation for its national clients, provided that Ferolie received the consideration required under the Agreement. *Id.* ¶ 15. ASM knew or should have known that Ferolie's February 4 letter did not constitute a rejection of Ferolie's participation in the Consolidation, because ASM never provided Ferolie with proper notice under Section 4(c) of the Agreement, nor had ASM offered Ferolie the consideration to which Ferolie was entitled under Section 4(b) of the Agreement. *Id.* Nevertheless, ASM informed Ferolie on February 5, 2004 that Ferolie's February 4 letter somehow "terminated Ferolie's ability to participate in the Transaction." *Id.*

**C.    Respondents Circumvent the California Department of Corporations
Decision, and Consummate the Consolidation in Violation of the Agreement.**

Meanwhile, on or about December 22, 2003 (unbeknownst to Ferolie at the time), Allied
Capital's subsidiary, ASM Inc., filed an application with the California Department of
Corporations ("CDOC") for a permit to issue securities in connection with the Consolidation. *Id.*
¶ 16. For such a permit to be issued, the CDOC would first have to hold a hearing to determine
that the terms and conditions of the Consolidation were "fair, just and equitable." *Id.* When
Ferolie finally became aware of the ASM Inc.'s application in or about February 2004, Ferolie
immediately sought to participate in the CDOC fairness hearing process, and argue that it had not
received proper notice of the Consolidation pursuant to Section 4(c) of the Agreement, and that it
was improperly denied its right to participate in the Consolidation pursuant to Section 4(b). *Id.*

On April 19, 2004, after considering various briefs and submissions, the Commissioner
of the CDOC issued a decision declining even to hold a fairness hearing on ASM Inc.'s
application until Ferolie's right to participate in the Consolidation was resolved. *Id.* ¶ 17.
However, by the time Ferolie learned of the CDOC Commissioner's decision in mid-May (the
CDOC omitted to copy Ferolie on its transmittal of the decision), ASM Inc. had already
withdrawn its application, and ASM and Allied Capital had secretly begun their plans to
consummate the Consolidation without a CDOC permit and without any adjudication of
Ferolie's right to participate therein. *Id.* ¶ 18.

Upon information and belief, to eliminate the need for a CDOC permit, ASM and Allied
Capital agreed to modify the terms, structure and/or certain elements of the Consolidation. *Id.* ¶
19. However, since this modification would by definition constitute a new "Transaction," the
Agreement required that Ferolie be given notice of and an opportunity to participate in the
modified Consolidation. *Id.* To avoid providing Ferolie with such notice, and/or in retaliation
for Ferolie's successful intervention in the CDOC fairness hearing process, ASM, in concert with
Allied Capital and ASM Inc., unilaterally deemed the Agreement "terminated" -- without basis
and in violation of Section 3 of the Agreement. *Id.* ¶ 20. ASM sent Ferolie a purported "notice

of breach" claiming that *Ferolie* had somehow breached the Agreement by: (i) holding itself out as an "affiliate" of ASM (notwithstanding Ferolie's status under the "*Affiliation* and Services Agreement"), (ii) communicating directly with an ASM third-party vendor in an effort to obtain the "seamless" retail reporting services that ASM refused to provide (notwithstanding that ASM had instructed Ferolie to contact the vendor directly for such purpose), and (iii) by successfully interfering with ASM Inc.'s CDOC Application (notwithstanding that, in so doing, Ferolie had properly exercised its First Amendment right to petition a government body). *Id.* ¶ 21.

ASM and Allied Capital then consummated the Consolidation on or about June 30, 2004 -- without providing notice to Ferolie, without affording Ferolie an opportunity to elect to participate, without compensating Ferolie for any of the business improperly gained by ASM at Ferolie's expense through breaches of the Agreement and other misconduct, and without any adjudication of Ferolie's contractual rights -- in patent circumvention of the CDOC decision and in violation of the Agreement. *Id.* ¶ 22. Thus, as a result of their Consolidation, ASM and Allied Capital have largely succeeded in accomplishing their scheme. *Id.* ¶ 23. To date, ASM has taken roughly 65% of Ferolie's national client business. *Id.*

**D.** **The Arbitration Provision and Respondents' Refusal to Arbitrate.**

The Agreement contains a broad arbitration provision, which states as follows:

> Dispute Resolution. Except as provided below, *all claims and disputes between or among the parties hereto,* including, without limitation, those arising under this Agreement (including, without limitation, its interpretation, enforcement, enforceability, termination or breach) *shall be submitted to arbitration before a single arbitrator in [] Chicago, Illinois*, under AAA procedural rules and Illinois discovery rules (subject to the arbitrator's sole discretion to impose limits on such discovery).

*Id.*, Ex. A § 17 (emphasis added).

Significantly, the arbitration provision applies not only to Ferolie and ASM, but also to ASM's acquirors or successors. Indeed, under Section 4(g) of the Agreement, ASM and its members were deliberately prohibited from consummating a transaction, such as the

Consolidation, unless ASM's "acquiror or successor therein expressly agrees in writing in favor of [Ferolie] to accept and assume the continued obligations of ASM under this Agreement . . . ." *Id.*, Ex. A § 4(g). Thus, pursuant to the express terms of the Agreement, prior to consummating the Consolidation, Allied Capital and ASM Inc. -- as ASM's acquirors/successors -- were required to accept and assume all of the continuing obligations of ASM under the Agreement in favor of Ferolie, including the obligation to arbitrate all disputes with Ferolie. *Id.* ¶ 25. Despite the clear and unambiguous arbitration provision in the Agreement, and despite Allied Capital's and ASM Inc.'s required acceptance and assumption of ASM's obligations thereunder, the Respondents have steadfastly refused to arbitrate their dispute with Ferolie. *Id.* ¶ 27.

In particular, on November 6, 2003, Ferolie served a Demand for Arbitration on ASM pursuant to the arbitration provision in Section 17 of the Agreement. *See* Declaration of David L. Harris, dated August 17, 2004 ("Harris Decl."), ¶ 2. Beginning in December 2003, after ASM ignored the Demand, Ferolie's attorneys, Lowenstein Sandler, called counsel for ASM several times and left phone messages advising counsel that the American Arbitration Association administered claims filed in Chicago (the arbitration forum bargained for in the Agreement) from Dallas, Texas. Lowenstein Sandler also informed counsel for ASM that the Center for Public Resources ("CPR") was the dominant ADR organization in Chicago. *Id.* ¶ 3.

After several phone calls over the course of several months, ASM's counsel finally responded, stating that ASM wanted to arbitrate in Chicago, but never giving ASM's position on whether it would agree to use the CPR. *Id.* ¶ 4. On May 18, 2004, Lowenstein Sandler wrote a letter to ASM's counsel again communicating Ferolie's desire to arbitrate its claims against ASM. *Id.*, Ex. A. In that letter, Lowenstein Sandler reminded ASM's counsel that the dispute between Ferolie and ASM required arbitration pursuant to Section 17 of the Agreement. *Id.* ASM's counsel, however, never responded. *Id.* ¶ 5. As such, on July 26, 2004, Lowenstein Sandler wrote yet another letter, this time to counsel for ASM, Allied Capital and ASM Inc., reiterating its position that all disputes between Ferolie and ASM were subject to arbitration pursuant to the plain terms of the Agreement. *Id.*, Ex. B. In the July 26 letter, Lowenstein

Sandler also noted that because the Consolidation had been consummated on or about June 30, 2004, it appeared that ASM's obligation to arbitrate under the Agreement now extended to Allied Capital and ASM Inc. as ASM's acquirors/successors. *Id.* Accordingly, Lowenstein Sandler asked all counsel to respond to the July 26 letter by advising whether their respective clients intended to arbitrate pursuant to the Agreement. *Id.*

In a letter dated July 28, 2004, counsel for ASM advised Lowenstein Sandler that because Ferolie had purportedly "waived" its right to arbitrate, ASM "does not consent to arbitration of Ferolie's claims and will resist any attempt by Ferolie to arbitrate its claims." *Id.*, Ex. C. In a letter dated July 29, 2004, counsel for Allied Capital advised Lowenstein Sandler that "Allied is not a party to the [Agreement], nor is Allied bound by the requirements of the [Agreement]," and that "Allied will not consent to arbitration of Ferolie's claims pursuant to the procedures provided in Section 17 of the [Agreement]." *Id.*, Ex. D. Finally, in a letter dated August 3, 2004, counsel for ASM Inc. advised Lowenstein Sandler that it was unable to respond to its July 26, 2004 letter at that time, but would "inform [Lowenstein Sandler] shortly of its position regarding arbitration." *Id.*, Ex. E. However, ASM Inc. failed to provide any further response and has otherwise continued its refusal to arbitrate against Ferolie. *Id.* ¶ 10.

Given the Respondents' obvious refusal to arbitrate, Ferolie formally served an Amended Demand for Arbitration on ASM, Allied Capital and ASM Inc. on August 10. *See* Pet., Ex. B . In the Amended Demand for Arbitration, Ferolie asserted claims for: (i) breach of contract, based on, among other things, ASM's failure to comply with the notice provisions under the Agreement, ASM's failure to allow Ferolie to participate in the Consolidation under the same terms and conditions as ASM's members, and ASM's failure to provide Ferolie with all services necessary to enable Ferolie to provide "seamless representation" to shared clients; (ii) tortious interference with contractual relations, based on Respondents' interference with Ferolie's contracts with its national clients; (iii) tortious interference with prospective economic advantage, based on Respondents' interference with Ferolie's business relationships with its existing national clients and its potential new clients; and (iv) tortious interference with

-8-

contractual relations against Allied Capital and ASM Inc., based on their interference with Ferolie's rights under the Agreement. *Id.* Contemporaneous with the service of the Amended Demand for Arbitration, Lowenstein Sandler transmitted to Respondents and their counsel a final written demand that Respondents proceed to arbitration as required under the Agreement's broad arbitration provision. *Id.*, Ex. C. To date, Respondents have failed to respond in any fashion to either the Amended Arbitration Demand or Lowenstein Sandler's August 10, 2004 letter.

**E.     ASM's and ASM Inc.'s Pending California Actions.**

On November 18, 2003, after ASM ignored Ferolie's initial November 6, 2003 arbitration demand, Ferolie was forced to file a federal antitrust action against ASM and Pen Write Systems, Inc. d/b/a PenRite Systems ("Pen Rite"), in the United States District Court for the Northern District of California (the "California Antitrust Action"), due to Pen Rite's and ASM's refusal to provide it with access to Pen Rite's "ARTS" retail reporting system. Harris Decl. ¶ 13. Ferolie was required to file the California Antitrust Action, rather than initiate an arbitration, because (i) Pen Rite was not a party to the Agreement between Ferolie and ASM, and (ii) Ferolie sought a temporary restraining order and preliminary injunctive relief to prevent the loss of one of its major clients who used the "ARTS" system. *Id.* ¶ 14. The Honorable Vaughn R. Walker, U.S.D.J., denied Ferolie's requests for emergent relief and ultimately dismissed Ferolie's claims. *Id.* That action nevertheless remains open because on May 11, 2004, ASM filed a counterclaim alleging that Ferolie breached the Agreement, and sought, *inter alia*, declaratory relief that Ferolie had been provided proper notice of the Consolidation pursuant to the Agreement, and that Ferolie's February 4, 2004 letter was not an election to participate in the Consolidation. *Id.*, Ex. F. Ferolie has since moved to stay ASM's counterclaim pending arbitration, with a hearing date set for September 9. *Id.* ¶ 15.

On May 13, 2004, ASM *Inc.* filed a related case in the Northern District of California also in connection with the Consolidation, seeking the same relief sought by ASM -- *i.e.*, a declaratory judgment that Ferolie did not elect to participate in the Consolidation. *Id.*, Ex. G.

Ferolie has since moved to dismiss ASM Inc.'s action for improper venue. *Id.* ¶ 16. The hearing date for that motion is also scheduled for September 9, 2004 before Judge Walker. *Id.*

After ASM Inc. rushed to the California courthouse to file its declaratory judgment action and after ASM once again rebuffed Ferolie's attempts to arbitrate the parties' disputes, Ferolie filed an action on May 28, 2004 against ASM, Allied Capital, and ASM Inc. in the United States District Court for the District of Columbia (the "DC Action"), seeking, *inter alia*, declaratory and injunctive relief based on Respondents' refusal to allow Ferolie to participate in the Consolidation. *Id.* ¶ 17. Because that action was filed ***before*** the Consolidation was consummated, Allied Capital and ASM Inc. were not parties to the Agreement at that time. *Id.* Indeed, because Allied Capital's and ASM Inc.'s principal places of business are both in Washington, D.C., and because the negotiations and meetings in connection with the Consolidation took place in Washington, D.C., that forum was the only viable venue for the DC Action. *Id.* ¶ 18. The DC Action was subsequently dismissed without prejudice for lack of federal diversity jurisdiction. *Id.*[1] As a result of the June 30 Consolidation, however, Allied Capital and ASM Inc. have now become the successors and acquirors of ASM, and thus are bound by ASM's obligations under the Agreement -- including ASM's obligation to arbitrate the current dispute. Thus, the proper forum to resolve the current dispute is the forum bargained for in the Agreement -- arbitration in Chicago, Illinois.

---

[1] Although ASM pleaded in its counterclaim in the California Antitrust Action that it was a California citizen for purposes of federal diversity jurisdiction, ASM (a limited liability company) has since conceded that it had a New Jersey member and thus was non-diverse with Ferolie (a New Jersey corporation) prior to the June 30 Consolidation. Based on this fact, Ferolie has moved in the California Antitrust Action to dismiss ASM's counterclaim for lack of subject matter jurisdiction. However, as set forth in Ferolie's Petition to Compel Arbitration, federal diversity jurisdiction exists in this case because, as a result of the June 30 Consolidation, ASM's members have now been consolidated into one entity, ASM Inc. -- a California corporation with its principal place of business in Washington, D.C. As such, ASM and Ferolie are now diverse for jurisdictional purposes.

-10-

## ARGUMENT

### THE DISPUTE BETWEEN FEROLIE AND RESPONDENTS IS SUBJECT TO THE FEDERAL ARBITRATION ACT AND MUST BE ARBITRATED.

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*, mandates the enforcement of arbitration agreements such as the one at issue here. It is well established that the FAA "leaves no place for the exercise of discretion by a district court" and instead "mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds. Inc. v. Byrd*, 470 U.S. 213, 218 (1985). The FAA thus reflects a liberal federal policy favoring arbitration agreements, and "questions of arbitrability must be addressed with a healthy regard" for this policy with "any doubts concerning the scope of arbitrable issues . . . be[ing] resolved in favor of arbitration." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). Pursuant to Section 4 of the FAA, 9 U.S.C. § 4, a district court is required to compel arbitration where, as here: "(1) a valid agreement to arbitrate exists, and (2) that agreement covers the underlying dispute." *Gingiss Int'l, Inc. v. L &H Tuxes, Inc.*, 2002 WL 1553289, at *3, 01-CV-7272 (N.D. Ill. July 15, 2002) (granting franchisor's petition to compel arbitration and ordering that parallel California state court proceedings initiated by franchisee be stayed).[2]

In this case, a valid agreement to arbitrate exists plainly exists. Moreover, because the arbitration provision here provides, in extremely broad terms, that *"all claims and disputes"* including, without limitation, those arising under the Agreement, "shall be submitted to arbitration before a single arbitrator in [] Chicago, Illinois," (Pet., Ex. A § 17 (emphasis added)), it can hardly be disputed that the Agreement covers Ferolie's claims. *See, e.g., Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909-910 (7th Cir. 1999) (holding that arbitration

---

[2] The Seventh Circuit has consistently held that where the arbitration agreement contains a forum selection clause, as here, only the district court *in that forum* can issue a Section 4 order compelling arbitration. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lauer*, 49 F.3d 323, 326 (7th Cir. 1995); *accord Kim v. Colorall Technologies, Inc.*, 2000 WL 1262667, at *1 n.1 (N.D. Cal. Aug. 18, 2000) (Walker, J.) (noting that under Section 4 of the FAA, a district court can only compel arbitration in its own district). Thus, because Section 17 of the Agreement specifically provides for arbitration to take place in Chicago, Ferolie's petition was properly filed in this Court.

provision which covered "any controversy or claim" arising out of a distributorship agreement was "extremely broad and capable of an expansive reach."); *J.J. Ryan & Sons v. Rhode Poulenc Textile, S.A.*, 863 F.2d 315, 321 (4th Cir. 1988) (finding that a broad arbitration clause "does not limit arbitration to the literal interpretation or performance of the contract. It embraces every dispute between the parties having a significant relationship to the contract regardless of the label attached to the dispute.").

Notwithstanding the clear and unambiguous arbitration provision, Respondents have concocted two excuses as to why they should not be compelled to arbitrate the current dispute. ASM maintains that it can avoid its crystal-clear obligation to arbitrate because by filing the California Antitrust Action and the DC Action, Ferolie has somehow waived its contractual right to arbitrate. *See* Harris Decl., Ex. C. Allied Capital, meanwhile, contends that it cannot be compelled to arbitrate against Ferolie because it was not a party to the Agreement. *Id.*, Ex. D. Both of these purported defenses fail to overcome the FAA's presumption of arbitrability.

**A.   ASM's Allegations Of Waiver Are For The Arbitrator to Decide And, In Any Event, Ferolie Has Not Waived Its Right to Arbitrate.**

As a threshold matter, the question of waiver is to be decided by the arbitrator, not the court. Indeed, the United States Supreme Court has confirmed that "procedural" questions which grow out of the dispute and bear on its final disposition are presumptively for an arbitrator, not a judge, to decide. *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002). Thus, "the presumption is that the arbitrator should decide 'allegations of waiver, delay, or a like defense to arbitration.'" *Id.* at 84 (citing *Moses H. Cone Memorial Hosp.*, 460 U.S. at 24-25). In light of *Howsam*, the Eight Circuit Court of Appeals recently held that the issue of whether a party waived its right to arbitrate by pursuing litigation in a judicial forum is a matter for the arbitrator to decide. *See Nat'l American Ins. Co. v. Transamerica Occidental Life Ins. Co.*, 328 F.3d 462, 466 (8th Cir. 2003).

Not only is the issue of waiver for the arbitrator to decide, but Ferolie has repeatedly expressed its intention -- even before the California Antitrust Action began -- to arbitrate claims

involving ASM. Indeed, Ferolie served an arbitration demand on ASM as far back as November 6, 2003. It was only after ASM ignored Ferolie's arbitration demand that Ferolie commenced the California Antitrust Action on November 18 and sought emergent court relief against ASM and Pen Rite. As explained above, because Pen Rite was not a party to the arbitration agreement, Ferolie was faced with only two choices: ignore ASM's failure to provide it with access to Pen Rite's "ARTS" retail reporting system and risk losing its national clients who used the ARTS system, or sue ASM in court. That Ferolie chose to protect its business interests by suing ASM and seeking emergent relief does not demonstrate its intent to waive arbitration. *See Ivax Corp. v. B. Braun of America, Inc.*, 286 F.3d 1309, 1316-18 (11th Cir. 2002) (defendant's filing of state court action against a party who was not subject to arbitration provision did not result in waiver); *see also Halim v. The Great Gatsby's Auction Gallery*, 2004 WL 434191, at *6-7, 03-CV-8414 (N.D. Ill. March 5, 2004) (finding no waiver of arbitration provision where defendant moved to dismiss the complaint). Likewise, the fact that Ferolie filed the DC Action does not constitute a waiver of its right to arbitrate. That action was filed *before* the Consolidation was consummated on June 30, 2004, and thus was filed *before* Allied Capital and ASM Inc. assumed ASM's obligation to arbitrate under the Agreement. Indeed, Ferolie has since made several attempts to proceed with arbitration once the Consolidated was carried out, but on each occasion, Respondents have refused to arbitrate. *See* Harris Decl. ¶¶ 7-12.

In addition, in neither the California Antitrust Action nor the DC Action did Ferolie initiate discovery requests against ASM. *See Williams v. Katten, Muchin & Zavis*, 837 F. Supp. 1430. 1442-43 (N.D. Ill. 1993) (finding no waiver even where party engaged in discovery). More importantly, even if Ferolie's persistent efforts to initiate arbitration are somehow misconstrued as indicating a preference for litigation, ASM cannot articulate the requisite prejudice it would suffer if forced to arbitrate its dispute with Ferolie. To be sure, none of the claims that are the subject of Ferolie's Amended Arbitration Demand and ASM's counterclaim (in the California Antitrust Action) have been adjudicated on the merits. Accordingly, Ferolie has not waived its right to arbitrate against ASM.

**B.** **Allied Capital and ASM Inc. Have Assumed ASM's Obligations Under The Agreement, Including Its Obligation to Arbitrate Against Ferolie.**

In refusing to arbitrate the current dispute, Allied Capital contends that it cannot be compelled to arbitrate against Ferolie because it was not a party to the Agreement. Harris Decl., Ex. D. It is well settled, however, that non-signatories to an arbitration agreement may be compelled to arbitrate. *See, e.g., Hoffman v. Deloitte & Touche, LLP*, 143 F. Supp. 2d 995, 1004-05 (N.D. Ill. 2001) (holding that an agreement containing an arbitration clause covered non-signatories under common law contract principles); *Marchetto v. DeKalb Genetics Corp.*, 711 F. Supp. 936, 939 (N.D. Ill. 1989) (holding that an arbitration provision was enforceable against a non-signatory successor corporation).

In *Fyrnetics Ltd. v. Quantum Group, Inc.*, 2001 WL 40900, 99-CV-4704 (N.D. Ill. Jan. 11, 2001), the court compelled the plaintiffs, two non-signatories to a license agreement, Kidde and Fyrnetics Hong Kong (FHK), to arbitrate their claims against the defendant-licensor. The court reasoned that Kidde was required to arbitrate because the original licensee had merged into Kidde, and therefore Kidde -- as the licensee's successor-in-interest -- had voluntarily assumed the licensee's obligations under the agreement. *Id.* at *3. Moreover, the court noted that Kidde had asserted claims in its complaint arising under the license agreement that were partly those of its predecessor (the original licensee and signatory), and thus it could not escape application of the license agreement's arbitration requirement. *Id.* The court also found that the other plaintiff, FHK, was bound by the arbitration agreement because it was a sublicense of the original signatory, and thus likewise assumed the agreement's obligations. *Id.* at * 4. *See also International Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 417 (4th Cir. 2000) (stating that if claims against two affiliated companies are based on the same facts and are inherently inseparable, the claims against both may be referred to arbitration even though just one of the companies is a party to the arbitration agreement).

As in *Fyrnetics*, Ferolie's claims here against Respondents, three closely related entities, are intertwined and Allied Capital and ASM Inc. should be held to the arbitration provision.

Allied Capital and ASM Inc. cannot escape the fact that Section 4(g) of the Agreement expressly provides that the Consolidation could not be completed unless ASM's "acquiror or successor therein expressly agrees in writing in favor of [Ferolie] to accept and assume the continued obligations of ASM under this Agreement . . . ." Pet., Ex. A § 4(g). Thus, now that the Consolidation has been consummated, Allied Capital and ASM Inc. -- as ASM's acquirors/successors -- were unconditionally required to accept and assume all of the continuing obligations of ASM under the Agreement in favor of Ferolie, including, of course, the obligation to arbitrate all disputes with Ferolie. *See McAlister Brothers, Inc. v. A & S Transportation Co.*, 621 F.2d 519 (2d Cir. 1980) (non-signatory may be bound by arbitration agreement in contract that specifically provided that companies affiliated with signatory were contractually bound). Moreover, ASM Inc. relied on the Agreement as the lynchpin of its complaint for a declaratory judgment that Ferolie had elected not to participate in the Consolidation. Harris Decl., Ex. G. As the *Fyrnetics* court held, a non-party to an agreement cannot assert claims arising under the agreement and then expect to escape application of the agreement's arbitration requirement.

## CONCLUSION

For the foregoing reasons, Petitioner Ferolie Corporation respectfully requests that the Court issue an Order and Judgment compelling Respondents to proceed with arbitration pursuant to the clear and unambiguous terms of the Agreement, together with such other and further relief as this Court may deem just and equitable, including the costs and disbursements of this action.

Respectfully submitted,

Dated: August 17, 2004

One of the Attorneys for Petitioner
FEROLIE CORPORATION

Mark P. Miller (06191128)
**WILDMAN HARROLD ALLEN & DIXON LLP**
225 W. Wacker Drive, Suite 3000
Chicago, Illinois 60606
Phone: 312.201.2000
Fax: 312.201.2555

-15-

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DISTRICT**

FEROLIE CORPORATION, )
          Petitioner, )   No. 04C 5425

v. )

ADVANTAGE SALES & MARKETING, LLC, )  **DECLARATION OF DAVID L.**
ALLIED CAPITAL CORPORATION and )  **HARRIS IN SUPPORT OF**
ADVANTAGE SALES & MARKETING, INC., )  **FEROLIE CORPORATION'S**
          Respondents. )  **PETITION TO COMPEL**
                         )  **ARBITRATION**

    I, **DAVID L. HARRIS**, of full age, hereby declare and say as follows:

    1.    I am a member of Lowenstein Sandler PC, counsel for Petitioner Ferolie Corporation ("Ferolie"). I make this declaration in support of Ferolie's petition to compel arbitration against Respondents Advantage Sales & Marketing, LLC ("ASM"), Allied Capital Corporation ("Allied Capital") and Advantage Sales & Marketing, Inc. ("ASM Inc."). As set forth below, despite Ferolie's repeated demands to resolve its current dispute with Respondents through arbitration, Respondents have failed, neglected or refused to arbitrate. Accordingly, Ferolie has been forced to bring the instant application to compel arbitration pursuant to Section 4 of the Federal Arbitration Act, 9 U.S.C. § 4.

**The Arbitration Provision and Respondents' Refusal to Arbitrate.**

    2.    On November 6, 2003, Ferolie served a Demand for Arbitration on ASM pursuant to the arbitration provision in Section 17 of the parties' Affiliation and Services Agreement (the "Agreement"). A copy of the Agreement is attached to Ferolie's Petition to Compel Arbitration as "Exhibit A." Section 17 requires ASM and Ferolie to arbitrate ***"all claims and disputes"*** between them, including, without limitation, those arising under the Agreement, before a single arbitrator in Chicago, Illinois. Despite this clear and unambiguous arbitration provision, ASM has steadfastly refused to arbitrate the current dispute with Ferolie.

DECLARATION OF DAVID L. HARRIS

3.     Beginning in December 2003, after ASM ignored Ferolie's initial Demand for Arbitration, I called counsel for ASM, William A. Despo, several times and left phone messages advising him that the American Arbitration Association administered claims filed in Chicago from Dallas, Texas. I also told him that Ferolie's Chicago counsel, Mark P. Miller, informed me that the Center for Public Resources (CPR) was the dominant ADR organization in Chicago. In addition, because both Mr. Despo and I resided in New Jersey, and because each of our clients had spent a small fortune on travel and hotel bills arbitrating a previous dispute, I inquired whether his client, ASM, would be willing to arbitrate in New Jersey to save hundreds of thousands of dollars in expenses.

4.     It took several phone calls over the course of several months to get one return call, and only then did I receive a partial answer. Mr. Despo informed me that ASM wanted to arbitrate in Chicago, but he never gave his position on whether he would agree to use the CPR.

5.     Thus, on May 18, 2004, I again wrote to Mr. Despo communicating Ferolie's desire to arbitrate its claims against ASM. In that letter, I reminded Mr. Despo that the dispute between Ferolie and ASM required arbitration pursuant to Section 17 of the Agreement. I also repeated my view that because both Mr. Despo and I reside in New Jersey, the most logical place for the arbitration to take place would be in New Jersey, but that Ferolie was nevertheless willing to arbitrate in Chicago (as specified under the Agreement) if ASM so desired. A copy of my May 18, 2004 letter is attached hereto as Exhibit A. I never received the courtesy of a response to my letter.

6.     Upon information and belief, on or about June 30, 2004, ASM and Allied Capital completed a "roll-up" transaction, or consolidation, of ASM's members (the "Consolidation") -- in which the ASM members and their individual ownership interests in ASM were acquired by Allied Capital for $257 million through its subsidiary formed for the purpose of the acquisition, ASM Inc. Pursuant to Section 4(g) of the Agreement, ASM and its members were deliberately prohibited from consummating a transaction, such as the Consolidation, unless ASM's "acquiror

or successor therein expressly agrees in writing in favor of [Ferolie] to accept and assume the continued obligations of ASM under this Agreement . . . ." In other words, pursuant to the express terms of the Agreement, prior to consummating the Consolidation, Allied Capital and ASM Inc. -- as ASM's acquirors/successors -- were required to accept and assume all of the continuing obligations of ASM under the Agreement in favor of Ferolie, including the obligation to arbitrate all disputes with Ferolie.

7.     As such, on July 26, 2004, my colleague, Bryan Blaney, wrote a letter to counsel for ASM, Allied Capital and ASM Inc., reiterating Ferolie's position that all disputes between Ferolie and ASM were subject to arbitration pursuant to the plain terms of the Agreement. I was copied on Mr. Blaney's July 26 letter, which is attached hereto as Exhibit B. In that letter, Mr. Blaney also noted that because the Consolidation had been consummated on or about June 30, 2004, it appeared that ASM's obligation to arbitrate under the Agreement now extended to Allied Capital and ASM Inc. as ASM's acquirors/successors. Accordingly, Mr. Blaney asked all counsel for the Respondents to reply to his July 26 letter by advising whether their respective clients intended to arbitrate the current dispute with Ferolie pursuant to the Agreement.

8.     In a letter dated July 28, 2004, counsel for ASM advised Mr. Blaney that because Ferolie had purportedly "waived" its right to arbitrate, ASM "does not consent to arbitration of Ferolie's claims and will resist any attempt by Ferolie to arbitrate its claims." A copy of the July 28, 2004 letter is attached hereto as Exhibit C.

9.     In a letter dated July 29, 2004, counsel for Allied Capital advised Mr. Blaney that "Allied is not a party to the [Agreement], nor is Allied bound by the requirements of the [Agreement]," and that "Allied will not consent to arbitration of Ferolie's claims pursuant to the procedures provided in Section 17 of the [Agreement]." A copy of the July 29, 2004 letter is attached hereto as Exhibit D.

10.     Finally, in a letter dated August 3, 2004, counsel for ASM Inc. advised Mr. Blaney that it was unable to respond to its July 26, 2004 letter at that time, but would "inform

DECLARATION OF DAVID L. HARRIS

[him] shortly of its position regarding arbitration." A copy of the August 3, 2004 letter is attached hereto as <u>Exhibit E</u>. However, ASM Inc. failed to provide any further response and has otherwise continued its refusal to arbitrate against Ferolie.

11.     Given the Respondents' obvious refusal to arbitrate, Ferolie formally served an Amended Demand for Arbitration on ASM, Allied Capital and ASM Inc. on August 10, 2004. A copy of the Amended Arbitration Demand is attached to Ferolie's Petition to Compel Arbitration as "Exhibit B."

12.     Contemporaneous with the service of the Amended Demand for Arbitration, I transmitted to Respondents and their counsel a final written demand that Respondents proceed to arbitration as required under the Agreement's broad arbitration provision. A copy of my August 10, 2004 letter is attached to Ferolie's Petition to Compel Arbitration as "Exhibit C." To date, Respondents have failed to respond in any fashion to either the Amended Arbitration Demand or my August 10 letter.

**ASM's and ASM Inc.'s Pending California Actions.**

13.     On November 18, 2003, after ASM ignored Ferolie's initial November 6, 2003 arbitration demand, Ferolie was forced to file a federal antitrust action against ASM and Pen Write Systems, Inc. d/b/a PenRite Systems ("Pen Rite"), in the United States District Court for the Northern District of California (the "California Antitrust Action"), due to Pen Rite's and ASM's refusal to provide it with access to Pen Rite's "ARTS" retail reporting system.

14.     Ferolie was required to file the California Antitrust Action, rather than initiate an arbitration, because (i) Pen Rite was not a party to the Agreement between Ferolie and ASM, (ii) Pen Rite's principal place of business was in the Northern District of California, and (iii) Ferolie sought a temporary restraining order and preliminary injunctive relief to prevent the loss of one of its major clients who used the "ARTS" system. The Honorable Vaughn R. Walker, U.S.D.J., denied Ferolie's requests for emergent relief and ultimately dismissed Ferolie's claims.

15.    However, that action nevertheless remains open because on May 11, 2004, ASM filed a counterclaim alleging that Ferolie breached the Agreement, and sought, among other things, declaratory relief that Ferolie had been provided proper notice of the Consolidation pursuant to the Agreement, and that Ferolie's February 4, 2004 letter to ASM was not an election to participate in the Consolidation. A copy of ASM's counterclaim is attached hereto as <u>Exhibit F</u>. Ferolie has since moved to stay ASM's counterclaim pending arbitration, with a hearing date set for September 9.

16.    On May 13, 2004, ASM *Inc.* filed a related case in the Northern District of California also in connection with the Consolidation, seeking the same relief sought by ASM -- *i.e.*, a declaratory judgment that Ferolie did not elect to participate in the Consolidation. Ferolie has since moved to dismiss ASM Inc.'s action for improper venue. A copy of ASM Inc.'s complaint is attached hereto as <u>Exhibit G</u>. The hearing date for that motion is also scheduled for September 9, 2004 before Judge Walker.

17.    After ASM Inc. rushed to the California courthouse to file its declaratory judgment action and after ASM once again rebuffed Ferolie's attempts to arbitrate the parties' disputes, Ferolie filed an action on May 28, 2004 against ASM, Allied Capital, and ASM Inc. in the United States District Court for the District of Columbia (the "DC Action"), seeking, among other things, declaratory and injunctive relief based on Respondents' refusal to allow Ferolie to participate in the Consolidation. Because that action was filed *before* the Consolidation was consummated, Allied Capital and ASM Inc. were not parties to the Agreement at that time.

18.    Indeed, because Allied Capital's and ASM Inc.'s principal places of business are both, upon information and belief, in Washington, D.C., and because the negotiations and meetings in connection with the Consolidation took place in Washington, D.C., that forum was the only viable venue for the DC Action. The DC Action was subsequently dismissed without prejudice for lack of federal diversity jurisdiction.

-5-

19.     As a result of the June 30 Consolidation, however, Allied Capital and ASM Inc. have now become the successors and acquirors of ASM, and thus are bound by ASM's obligations under the Agreement -- including ASM's obligation to arbitrate the current dispute.

20.     Thus, the proper forum to resolve the current dispute is the forum bargained for in the Agreement -- arbitration in Chicago, Illinois.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

David L. Harris

Dated: August 17, 2004

# See Case File for Exhibits

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

# Civil Cover Sheet

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use <u>only</u> in the Northern District of Illinois.

---

**Plaintiff(s): Ferolie Corporation**

County of Residence: Bergen

Plaintiff's Atty: Mark P. Miller
Wildman Harrold
225 West Wacker Drive, Chicago,
IL 60606
(312) 201-2000

**Defendant(s):Advantage Sales & Marketing, LLC, Allied Capital Corporation, and Advantage Sales & Marketing, Inc.**

County of Residence:

Defendant's Atty:    JUDGE NORGLE

# 04C 5425

MAGISTRATE JUDGE BOBRICK

II. Basis of Jurisdiction:    **4. Diversity (complete item III)**

III. Citizenship of Principal Parties
**(Diversity Cases Only)**

Plaintiff:-**5 Non IL corp and Principal place of Business outside IL**
Defendant:-**5 Non IL corp and Principal place of Business outside IL**

DOCKETED
AUG 1 8 2004

IV. Origin :    **1. Original Proceeding**

V. Nature of Suit:    **190 Other Contract**

VI.Cause of Action:    **28 USC Sec. 1332(a)(1); 28 USC Sec. 1391(a)(3); 9 USC Sec. 4**

VII. Requested in Complaint
Class Action:**No**
Dollar Demand:**N/A**
Jury Demand:**No**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

FILED FOR DOCKETING
04 AUG 17 PM 4:10
CLERK U.S. DISTRICT COURT

**Signature:**

**Date:** 8/17/04

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

### EASTERN DIVISION

In the Matter of

Ferolie Corporation

v.

Advantage Sales & Marketing, LLC, Allied Capital
Corporation, and Advantage Sales & Marketing, Inc.

JUDGE NORGLE

Case Number:

04C 5425

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Ferolie Corporation

MAGISTRATE JUDGE BOBRICK

| (A) | | | (B) | | |
|---|---|---|---|---|---|
| SIGNATURE | | | SIGNATURE *Denisa A. Lazar* | | |
| NAME Mark P. Miller | | | NAME Denisa A. Lazar | | |
| FIRM Wildman Harrold Allen & Dixon LLP | | | FIRM Same as A | | |
| STREET ADDRESS 225 West Wacker Drive | | | STREET ADDRESS | | |
| CITY/STATE/ZIP Chicago, Illinois 60606 | | | CITY/STATE/ZIP | | |
| TELEPHONE NUMBER (312) 201-2000 | FAX NUMBER (312) 201-2555 | | TELEPHONE NUMBER | FAX NUMBER | |
| E-MAIL ADDRESS millerm@wildmanharrold.com | | | E-MAIL ADDRESS | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06191128 | | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6256147 | | |
| MEMBER OF TRIAL BAR? | YES ☑ | NO ☐ | MEMBER OF TRIAL BAR? | YES ☐ | NO ☒ |
| TRIAL ATTORNEY? | YES ☑ | NO ☐ | TRIAL ATTORNEY? | YES ☐ | NO ☒ |
| | | | DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO ☐ |
| (C) | | | (D) | | |
| SIGNATURE | | | SIGNATURE | | |
| NAME | | | NAME | | |
| FIRM | | | FIRM | | |
| STREET ADDRESS | | | STREET ADDRESS | | |
| CITY/STATE/ZIP | | | CITY/STATE/ZIP | | |
| TELEPHONE NUMBER | FAX NUMBER | | TELEPHONE NUMBER | FAX NUMBER | |
| E-MAIL ADDRESS | | | E-MAIL ADDRESS | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | |
| MEMBER OF TRIAL BAR? | YES ☐ | NO ☐ | MEMBER OF TRIAL BAR? | YES ☐ | NO ☐ |
| TRIAL ATTORNEY? | YES ☐ | NO ☐ | TRIAL ATTORNEY? | YES ☐ | NO ☐ |
| DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO ☐ | DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO ☐ |

DOCKETED
AUG 1 8 2004

FILED FOR DOCKETING
04 AUG 17 PM 4:10
U.S. DISTRICT CLERK COURT

1-5